No. 24-1499

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

JOANNE WALSH,
*Plaintiff-Appellant*,

*v.*

HNTB CORP.,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
Case No. 1:22-CV-10453-NMG

**BRIEF OF APPELLANT JOANNE WALSH**

Michaela C. May (1st Cir. Bar #1152971)
Zachary H. Hammond (1st Cir. Bar #1199716)
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
T: (617) 577-8800 x211
F: (617) 577-8811
mmay@bennettandbelfort.com
zhammond@benenttandbelfort.com

## TABLE OF CONTENTS

Contents....................................................................................................... ii

Table of Authorities......................................................................................v

Statement in Support of Oral Argument ...................................................1

Jurisdictional Statement ............................................................................1

Statement of Issue Presented ....................................................................4

Statement of the Case.................................................................................4

    I.    Facts Relevant to this Appeal .......................................................4

    II.   Relevant Procedural History.........................................................13

Summary of the Argument.......................................................................14

Argument...................................................................................................20

    I.    This Court has Jurisdiction Over Walsh's Timely
          Appeal of the District Court's Grant of Summary Judgment..................20

          A. Walsh Filed a Timely Notice of Appeal .............................................20

             1.   Walsh's Initial *Pro Se* Motion, Filed Within 30 Days
                 of the Court's Summary Judgment Decision and
                 Order, was the "Functional Equivalent" of Notice of
                 Appeal Sufficient to Meet Her Obligations
                 under Fed. R. App. P. 3................................................20

             2.   In Any Event, the District Court Acted within Its
                 Discretion In Enlarging the *Pro Se* Plaintiff's
                 Time to File a Notice of Appeal....................................25

    II.   This Court Should Reverse the District Court's Grant of
          Summary Judgment on Walsh's Age Discrimination Claims
          Complaint. ...........................................................................28

          A. Standard of Review .........................................................................28

B. Genuine Issues of Material Fact Preclude Summary
Judgment on Walsh's Age Discrimination Claims ............................29

   1. Viewing of Facts in the Light Most Favorable
     to Walsh, Plaintiff Has Met Her Modest Burden
     to Establish a *Prima Facie* Case .....................................................30

      a. HNTB'x Actions, Taken Together Constitute An
        'Adverse Action' Under *Muldrow v. City of St. Louis* ..............31

      b. The Jury Is Also Entitled to Find that HNTB
        Constructively Discharged Walsh by Imposing an
        Increasing Hostile Work Environment that, Viewed
        Cumulatively, Left Walsh and Her Older Peer
        Feeling Like They Had No Viable Choice but
        to "Resign" ..................................................................................34

      c. Walsh Establishes the First and Second Elements
        of a *Prima Facie* Case of Age Discrimination.........................37

      d. Finally, a Jury is Entitled to Find that the Adverse
        Actions Here Occurred in Circumstances that
        Would Raise a Reasonable Inference of Unlawful
        Discrimination.............................................................................38

   2. Because HNTB's Proffered Legitimate,
     Non-Discriminatory Reason Is Unsupported by
     Admissible Evidence, But Instead Relies Merely on Layers of
     Inadmissible Hearsay, the Company has Failed to Meet
     Its Burden Necessary to Overcome the Presumption
     of Walsh's *Prima Facie* Case........................................................40

   3. In Any Event, A Jury is Entitled to Find Pretext............................43

      a. HNTB's Criticisms of Walsh Are Rife with
        Indicia of Pretext........................................................................44

        i. The Jury May Infer Pretext From Evidence
           That HNTB's Explanations Are Inconsistent,
           Contradicted, and "Unworthy Of Credence" .................44

ii.    The Jury May Infer Pretext from Ambiguities
HNTB's Stated Rationale .................................................46

iii.    The Jury May Reason That Subjecting a
25-Year Employee to a PIP For a "Messy"
Office Does Not Pass the "Straight-Faced Test" ...........47

iv.    The Jury May Infer Pretext From HNTB's
Mistreatment of Walsh and Allinson, On One
Hand, and the Preferential Treatment Afforded
the Two Younger TSR's, On the Other Hand. ...............48

b.    A Jury Is Entitled to Infer Age Bias From References
to "Younger, Cheaper" Workers, HNTB's Claims
That Was Walsh Was Not "Flexible" In Her Thinking
and Struggled To "Maintain Pace" With HNTB's
Business Demands, and Similar Commentary
Evincing Age-Based Biases. .....................................................49

Conclusion/Relief Sought ..........................................................................52

Certificate of Compliance ...........................................................................52

Certificate of Service ...................................................................................53

Addendum ...........................................................................................ADD i

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Adams v. Schneider Electric USA*, 492 Mass. 271 (2023)................................ *passim*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................28

*Becker v. Montgomery*, 532 U.S. 757 (2001) ........................................................24

*Beyer v. County of Nassau*, 524 F.3d 160 (2d Cir. 2008).......................................32

*Blare v. Husky Injection Molding System Boston*,
    419 Mass. 437 (1995) ........................................................................................28

*Boechler, P.C. v. Commissioner*, 596 U.S. 199 (2022). ..........................................27

*Boivin v. Black*, 225 F.3d 36 (1st Cir. 2000). ........................................................21

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ...................................................31

*Bowles v. Russell*, 551 U.S. 205 (2007)................................................................25

*Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672 (2016) ............................ 14, 44, 49

*Burns v. Johnson*, 829 F.3d 1(1st Cir. 2016) .........................................................35

*Campiti v. Matesanz*, 333 F.3d 317 (1st Cir. 2003).................................. 21, 22, 23

*Chertkova v. Connecticut General Life Insurance Co.*,
    92 F.3d 81 (2d Cir. 1996) ............................................................................ 17, 35

*Conn v. American National Red Cross*, 149 F. Supp. 3d 136
    (D.C. Dist. Ct. 2016)..........................................................................................39

*Cruzado v. Alves*, 89 F.4th 64 (1st Cir. 2023) ...................................... 21, 22, 23, 24

*Diaz v. Jiten Hotel Management*, 762 F. Supp. 2d 319
    (D. Mass. 2011)..................................................................................................37

*Dominguez-Cruz v. Suttle Caribe, Inc.*,
    202 F.3d 424 (1st Cir. 2000)................................................................ 39, 45, 50

*EEOC v. Wyoming*, 460 U.S. 226 (1983) .................................................................29

*Forsythe v. Wayfair Inc.*, 27 F.4th 67 (1st Cir. 2022)...............................................48

*Fort Bend County v. Davis*, 587 U.S. 541 (2019)......................................................26

*Garside v. Osco Drug, Inc.*, 895 F.2d 46 (1st Cir. 1990) ........................... 29, 41, 42

*Gillen v. Fallon Ambulance Service, Inc.*,
   283 F.3d 11 (1st Cir. 2002)..................................................................................31

*Greene v. Walgreen Eastern Co.*, No. 16-2487,
   2018 U.S. App. LEXIS 37105, at *14 (1st Cir. Nov. 15, 2018).........................52

*GTE Products Corp. v. Stewart*, 421 Mass. 22, 34 (1995) ................................ 17, 34

*Hamer v. Neighborhood Housing Services*, 583 U.S. 17 (2017).................... *passim*

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).......................................... 29, 40

*Hodgens v. General Dynamics Corp.*,
   144 F.3d 151(1st Cir. 1998)..................................................................................43

*Holsum De Puerto Rico, Inc. v. National Labor Relations Board*,
   456 F.3d 265 (1st Cir. 2006)......................................................................... 48, 49

*Kelley v. Correctional Medical Services*,
   707 F.3d 108 (1st Cir. 2013)................................................................................47

*Knight v. Avon Products, Inc.*,
   438 Mass. 413 (2003) .................................................................................... 48, 49

*Kontrick v. Ryan*, 540 U.S. 443 (2004)....................................................................26

*Kosereis v. State of Rhode Island*, 331 F.3d 207 (1st Cir. 2003) .................... 15, 31

*Lipchitz v. Raytheon Co.*, 434 Mass. 493 (2001)....................................................44

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)........................................................................... *passim*

*Muldrow v. City of St. Louis*, *See* 601 U.S., 346 (2024)................................ *passim*

*Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004) .............................. 16, 34

*Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st. Cir. 2001)................................31

*Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000).................... *passim*

*Rios v. Centerra Group LLC*, 106 F.4th 101 (1st Cir. 2024)........................... 32, 33

*Rose v. New York City Board of Education*,
    257 F.3d 156 (2d Cir. 2001) ........................................................................ 38, 50

*Salvi v. Suffolk County Sheriff's Dept.*,
    67 Mass. App. Ct. 596, (2006)..............................................................................35

*Shager v. Upjohn Co*., 913 F.2d 398 (7th Cir. 1990) ...............................................40

*Smith v. Barry*, 502 U.S. 244 (1992) ................................................................ 21, 24

*Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19
    (1st Cir. 2015) (ADEA) ................................................. 30, 40, 41, 43

*Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999)...............................48

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)........................................41

*Sullivan v. Liberty Mutual Insurance Co.*, 444 Mass. 34 (2005) .............. 30, 31, 37

*Taite v. Bridgewater State University Board of Trustees*,
    999 F.3d 86 (1st Cir. 2021)....................................................................................43

*Tang v. Citizens Bank, N.A.*, 821 F.3d 206 (1st Cir. 2016) ....................................46

*Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003) ......................................................35

*Texas Dept. of Community Affairs v. Burdine*,
    450 U.S. 248 (1981)......................................................................... 31, 37, 41, 42

*Thomas v. Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999).................... 19, 50, 51

*Torres v. Oakland Scavenger Co.*, 487 U.S. 312 (1988).........................................21

*United States v. Gooch*, 842 F.3d 1274 (D.C. Cir. 2016)........................................23

vii

*Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382 (2016) ................................................................. 41, 44

*Wadsworth v. Nguyen*, 129 F.4th 38 (1st Cir. 2025). ............................................28

*Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998)……………………............41

*Wheatley v. Amer. Tel. & Tel. Co.*, 418 Mass. 394 (1994).....................................33

*Williams v. Raytheon Co.*, 220 F.3d 16 (1st Cir. 2000)...................................... 18, 44

*Yee v. Massachusetts State Police*, 481 Mass. 290 (2019) .....................................32

*Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40 (1st Cir. 2002) ..................41

## Statutes, Rules, and Regulations

28 U.S.C. § 2107(c) ................................................................. 14, 15, 25

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1367(a) ...........................................................................1

29 U.S.C. § 216(b) ...........................................................................52

29 U.S.C. § 621 ..............................................................................1, 4

29 U.S.C. § 623(a)(1)........................................................................31

29 U.S.C. § 623(j) ............................................................................29

42 U.S.C. § 2000e-2(a)(1)..................................................................31

Fed. R. App. P. 3 .................................................................... *passim*

Fed. R. App. P. 3(a) .................................................................. 20, 21

Fed. R. App. P. 3(c)(1)......................................................................20

Fed. R. App. P. 3(c)(1)(b)...................................................................23

Fed. R. App. P. 3(c)(2)................................................................21

Fed. R. App. P. 4......................................................... 14, 22

Fed. R. App. P. 4(a)(5)(C) ......................................... 25, 26, 27

Fed. R. App. P. 4(c)(2)..............................................................22

Mass. Gen. Laws ch. 151B ................................................ *passim*

Mass. Gen. Laws ch. 151B, § 4(1B).......................................1, 4

Mass. Gen. Laws ch. 151B, § 9 ...................................... 32, 52

**Other Authorities**

*Flanagan v. City of Lawrence School Dept.*, No. 03-BEM-02592,
     2010 MCAD LEXIS 6 (Massachusetts Commission Against
     Discrimination March 24, 2010)...........................................................39

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Plaintiff-Appellant Joanne Walsh ("Walsh" or "Plaintiff") respectfully

requests oral argument on this appeal. Resolution of this appeal involves

consideration of nuanced facts and complex, evolving issues of employment law.

The District Court did not conduct oral argument. Walsh believes that oral

argument would aid in clarifying the record and parsing the legal issues at hand.

**JURISDICTIONAL STATEMENT**

Plaintiff-Appellant Joanne Walsh commenced this action in the

Massachusetts Superior Court on March 1, 2022. Appendix ("Appx.") 64.

Plaintiff's complaint brings claims against Defendant-Appellee HNTB Corporation

("HNTB" or "Defendant") for age discrimination under Mass. Gen. Laws. ch.

151B, § 4(1B) ("Chapter 151B") (Count I), the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (Count II), and for breach of the covenant

of good faith and fair dealing under Massachusetts law (Count III). Appx. 64-70.

On March 22, 2022, HNTB withdrew this action to the U.S. District Court for the

District of Massachusetts ("District Court"). Appx. 3. The District Court exercised

subject matter jurisdiction over Walsh's federal claim due to the existence of a

federal question under 28 U.S.C. § 1331 and supplemental jurisdiction over the

Massachusetts law claims under 28 U.S.C. § 1367(a).

On December 21, 2023, the District Court granted HNTB's motion for summary judgment in its entirety. Appx. 10; Addendum ("Add.") 1. Judgment for HNTB entered that day. Appx. 10. From thereon, until appearance of the undersigned appellate counsel, Walsh proceeded *pro se*. Appx. 10-13, 29. On January 19, 2024, Walsh filed a motion seeking the Court's leave to extend the deadline to file her Notice of Appeal by 60 days. Appx. 10, 13. For reasons unknown, the District Court did not act on Plaintiff's motion until March 13, 2024, when the Court granted Walsh's motion, imposing a deadline of March 29, 2024, for Plaintiff to file a Notice of Appeal. Appx. 10, 14. A copy of that order was mailed to Walsh. Appx. 10.

On March 18, 2024, Walsh filed a second, *pro se* request for an extension to file a Notice of Appeal. Appx. 10, 15. HNTB filed an opposition on April 1, 2024. Appx. 10, 16. The District Court treated Walsh's request as a motion for an extension of time to file her Notice of Appeal. Appx. 1, 22. On April 26, 2024, the District Court granted Walsh's motion in part and denied it in part, ordering that Walsh file a notice of appeal on or before May 10, 2024, which was a Friday. *Id.* Unfortunately, however, the District Court did not send a copy of that order to the *pro se* Walsh. Appx. 10-11, 22-23, 30-31.

On Monday, May 13, 2024, Walsh learned for the first time of the District Court's order of April 26. Appx. 31. Later that same day, Walsh called the District

Court clerk, who checked the docket and acknowledged that, to his surprise, the Court had erroneously failed to mail a copy of the order to Walsh. *Id.* The Clerk suggested that Walsh send him a PDF document explaining the situation and asking for a short extension. *Id.* Walsh complied, that same day. Appx. 11, 31-32, 51, 53. On May 15, 2024, Walsh filed a motion for leave to file a late notice of appeal, which attached Plaintiff's proposed notice of appeal. Appx. 11, 53-54. The District Court granted that motion the following day, May 16, 2025. Appx. 26-27. On May 17, 2025, the District Court granted Walsh's motion of May 13. Appx. 11. Walsh filed a formal Notice of Appeal on May 18, 2024. Appx. 11, 28.

Walsh then secured the undersigned counsel for her appeal. On July 11, 2024, this Court *sua sponte* entered an order directing Walsh to show cause why the appeal should not be dismissed as untimely. Add. 14-15. On July 23, 2024, Walsh timely responded to the Order to Show Cause. In a reply dated August 8, 2024, HNTB moved to dismiss this appeal as untimely. On June 3, 2025, this Court (Kayatta, J.) denied HNTB's Motion to Dismiss and ordered that this case proceed to a full appellate briefing, including on timeliness and jurisdictional issues. Add. 16.

For these reasons, and as addressed in greater detail on pages pp. 20-27, *infra*, this Court has jurisdiction over Walsh's appeal.

## STATEMENT OF ISSUES PRESENTED

1.     Does this Court have Jurisdiction Over Walsh's Appeal?

2.     Should this Court Reverse the District Court's grant of Summary Judgment on Walsh's claim under M.G.L. c. 151B, § 4(1B)?

3.     Should this Court Reverse the District Court's grant of Summary Judgment on Walsh's claim under the ADEA, 29 U.S.C. § 621, *et seq.*?

## STATEMENT OF THE CASE

## I.     FACTS RELEVANT TO THIS APPEAL

Plaintiff-Appellant Joanne Walsh ("Walsh" or "Plaintiff") was born in 1964 and was 55 years old[1] when Defendant HNTB Corporation ("HNTB" or "Defendant") constructively discharged her after 26 years of employment. Appx. 99-100, 104-105. HNTB is a civil engineering company, and Walsh had worked in its Information Technology department from January 1994 until September 2020, most recently as a Technical Service Representative II, commonly known as a TSR-2. Appx. 99-100, 104, 188, 197-198.

As a TSR-2, Walsh's duties included addressing technology issues, fixing software and hardware problems, managing the lease cycle of laptops, and providing IT support to HNTB employees. Appx. 101-104. HNTB assigned one other TSR-2 besides Walsh to its Boston office. Appx. 102. Walsh received daily

---

[1]     All ages are stated as of the date of Walsh's constructive discharge, i.e. September 11, 2020, unless otherwise stated. *See* Appx. 99.

compliments from end-users. Appx. 246. She interacted with them easily, and never received any complaints from them. *Id.*

Lindsay Allinson ("Allinson"), age 59, was also a TSR-2. Appx. 101-102, 153. Allinson worked with Walsh for the entirety of Walsh's employment with HNTB. Appx. 101-102. Walsh and Allinson provided IT support for HNTB's locations in the Northeast, including offices in Massachusetts, Connecticut, New Hampshire, Maine and Pittsburgh, PA. Appx. 101-104. HTNB constructively discharged Allinson on September 11, 2020, the same date as Walsh. Appx. 105, 116, 153. At the time, both Walsh and Allinson reported to Dan Vealey ("Vealey"), a TSR-4. Appx. 105, 116. Two younger TSR's—TSR-2 Gregory DeMarinis ("DeMarinis"), age 32, and TSR-1 Renaldo Cordero ("Cordero")[2]— provided support for the remainder of HNTB's Northeast offices. Appx. 112, 153.

Walsh received merit-based pay increases nearly every year until 2016, when she was 52 years old. Appx. 115, 197-198. In 2017, she received only a small raise of 1 percent, which was far less than raises Company-wide. *Id.* After that, HNTB did not increase Walsh's salary. Appx. 197. HNTB claimed that Walsh's and Allinson's salaries were "capped" in their role, although their previous supervisor denied any knowledge of such a limit. Appx. 253-254. Various

---

[2]     The summary judgment record does not reveal Cordero's precise age and HNTB does not provide this information.  *See* Appx. 121.

managers commented that Walsh and Allinson had been in their roles "forever." Appx. 169, 257-258.

At the same time, HNTB's own records show Walsh's continued solid performance. Appx. 173. Walsh's performance review for 2018, delivered in the spring of 2019,[3] showed that she was meeting HNTB's expectations, and that she was a star performer in many ways. Appx. 133-139, App. 269. The review—co-authored by Vealey and Jim Clark ("Clark"), Manager of IT Customer Support—praised her "diligence," "accuracy" and "timeliness" and lauded her as "[d]ependable and trustworthy." Appx. 133-134, 182. Vealey remarked on Walsh's persistence, noting that "[s]he always seeks the right answer to be successful in accomplishing any task." *Id*. He likewise extolled her adaptability, her willingness to solicit feedback or assistance, her creativity, and her "high level of technical excellence." Appx. 134-136. Vealey praised Walsh even further:

> As a long-time member of IT, Joanne has a tremendous passion for running the show. Her determination and depth of knowledge, as well as her uncanny memory, allow her to explore every possibility when solving a problem. Her 20+ years of experience have served to give the customers great confidence that they will be taken care of to the best of her ability.

Appx. 136. Vealey worked with Walsh for more than 20 years and was her supervisor leading up to the end of her employment. Appx. 187. Clark, who was

---

[3]     Performance reviews were delivered each April for the prior calendar year. Appx. 105, 110.

Vealey's boss, interacted with Walsh about two to three times per month. Appx. 271. Clark's manager, David Gregory ("Gregory") interacted with Walsh with even less frequency. *Id.*

Despite such praise, and although she met expectations overall, Walsh's 2018 review also claimed, without details, that Walsh demonstrated a "**lack of initiative to stretch beyond the day-to-day and the status quo** of the Boston area offices . . . The review stated, "The reality of our team is **that we all need to act globally, creatively and flexibly**." Appx. 133 (emphasis added)." "If that remains a challenge for Joanne, **she will struggle to maintain pace** with what the business demands of us." Appx. 138 (emphasis added). The review did not describe Walsh's alleged failing to "stretch" herself, nor did it state that she was struggling to "maintain pace" with HNTB's business demands. *Id.*

On August 1, 2019, HNTB abruptly put Walsh on a performance improvement plan (PIP) —the first and only in her career. Appx. 127, 130, 243, 282. Allinson was put on a "virtually identical" PIP on the same day. Appx. 231, 273-274. Walsh had never received a verbal or written warning before. Appx. 243.

Gregory, who was Clark's manager, decided to place Walsh and Allinson (both in their 50s) on PIPs. Appx. 270, 272. Gregory was 40 years old at the time and, again, rarely interacted with Walsh. Appx. 169, 270-271, 276. The summary judgment record contains no testimony from Gregory himself. Clark testified that

7

Gregory said that he based his decision to place Walsh on a PIP on "feedback from some leadership . . . that they were not getting what they needed from [Walsh] in terms of either responsiveness or technology they were needing. Generally, it was being perceived that Joanne was kind of getting in the way of what they needed" Appx. 271-272. According to Clark, Design Build President Phil Brake ("Brake") and Office Leader IV Gary Bua ("Bua") complained to the then-Chief Information Officer, Steve Hague ("Hague"), who in turn passed on these purported complaints to Mark Dutton, Director-Technology Deliver, and in turn, Gregory. Appx. 88, 272. In his testimony, Clark also pushed back on the idea that this "feedback" related to the employees' performance and testified that the PIP he drafted was based on information relayed through Gregory. Appx. 149.

The summary judgment record also does not contain testimony from Bua or Brake, nor does it contain any non-hearsay account of their alleged observations of Walsh's (or Allinson's) job performance. HNTB conducted no investigation into these alleged complaints, and indeed, to the best of Clark's knowledge, Gregory did not speak to anyone else about them either. Appx. 149. Clark testified that he was surprised by the decision to put Walsh on a PIP and agreed Walsh's PIP was almost identical to Allinson's. Appx. 271, 273. Clark believed that Walsh "met expectations" in both 2018 and 2019, as compared to other TSR-2s employed by

8

HNTB at the time. Appx. 269. Clark believed that Allinson was meeting expectations as well. Appx. 149.

Although Vealey was Walsh's direct supervisor at the time of the PIP, he also did not have advanced notice of the PIP and was not asked for any input about it. Appx. 127, 229. Vealey corroborated that the PIP did not come from him, and that before the PIPs were issued to Walsh and Allinson, he had never worked with or supervised anyone at HNTB who had been placed on a PIP. Appx. 227-228. Vealey believed that Walsh was "competent at her job." Appx. 236.

Further, although Vealey was tasked with helping Walsh to meet the PIP's goals, he was unable to explain what various components of the PIP meant. Appx. 229, 230. For example, the PIP claimed that Walsh did not "adequately represent the customer service focus that is critical to the success of a TSR," which Vealey found "subjective" and could not define. Appx. 118-119, 229. Vealey also thought it was "unusual" that Allinson and Walsh were issued "virtually identical" PIPs on the same day. Appx. 232-233.

The PIP made three claims: (1) that Walsh was "an impediment to the success/performance of the office," including because she spent too much time in the IT office and (without any examples) because she did not provide sufficient "customer service"; (2) that her work area was "messy"; and that (3) she was not adequately improving on prior critiques, in particular the suggestion that Walsh

9

"stretch" herself. Appx. 118-119. The PIP instructed Walsh to take various actions, for example, to "look for creative IT solutions to solve business problems" and to be "more proactive." Appx. 119. The PIP promised that Clark would meet with Walsh monthly to assess her progress, but that never happened. Appx. 118.

Almost immediately after being put on the PIP, Walsh developed hives and experienced anxiety and panic attacks, for which she was prescribed medication. Appx. 261-264. After the PIP was issued, Vealey repeatedly told Walsh, "**The company is not getting its return investment for you. You can be replaced with younger, cheaper people.**" Appx. 251-252 (emphasis added). He made this comment in reference to both Walsh and Allinson. *Id.* When she was given the PIP, Walsh was told that the alleged deficiencies in the PIP had been problematic for years. Appx. 243. Walsh asked Clark, who had written the PIP at Gregory's instruction, who had provided the feedback that resulted in the PIP, or for examples of incidents that led to the PIP. Appx. 255. Clark declined, belligerently telling Walsh to "shut up." Appx. 255.

The PIP was set for 90 days, ending on November 1, 2019. Appx. 118. On the 90th day, Clark told Walsh without any details that she had "barely improved enough to get off the PIP." Appx. 256. For the most part, Walsh was not told whether she had completed the PIP's objectives. *Id.* During the PIP period, Clark did not provide any feedback, despite the promised, 30-day check-ins. Appx. 118,

256. In contrast to the sharp rebukes in the PIP he had prepared, Clark testified that

Walsh's performance, as compared to other TSRs, "met expectations" in both 2018

and 2019. Appx. 269.

Walsh's performance review for the year 2019 likewise sharply contrasted

the PIP in various ways, stating:

> Joanne has been a long trusted member of the IT team for her
> technical abilities. There is always a high degree of confidence that
> she will find a solution to most problems. Joanne is not afraid to
> pursue answers to technical issues on her own or through
> communications with others.

Appx. 143. The review found that Walsh's "technical skills are very solid" and that

her daily performance remained consistent with past performance. Appx. 142.

Despite such effusive praise, the review also claimed that Walsh

"inconsistently met expectations" overall in the year 2019. Appx. 141. The review

also noted, however, that some issues were not attributable to Walsh, for example

"a heavy influx of new hires beyond Joanne's control." *Id.* The review also opined

that, while Walsh did not utilize Corporate IT's Microsoft Teams for assistance,

she used the platform to help others. Appx. 143. Indeed, Walsh may have used

Teams less often as compared to other TSRs because she was "an experienced IT

person" who may not need to seek help as often as other TSRs. Appx. 143. In other

words, the review penalized Walsh for her experience.

11

In the aftermath of the PIP, Vealey began to treat Walsh and Allinson in a hostile and markedly different manner as compared to his behavior toward the two, younger TSRs, DeMarinis and Cordero, whom he also supervised. Appx 112-114. Vealey screamed at Walsh and Allinson, repeatedly. Appx. 114. Vealey gave the younger TSRs different instructions than Walsh and Allinson, and he gave the younger workers or himself credit for Walsh and Allinson's work. Appx. 112-113. Vealey lobbed unsupported and unjust criticism at Walsh and Allinson, for example by claiming that they were slow in taking up support tickets that were just a few minutes old. Appx. 113. Vealey stripped Walsh and Allinson of some of their job duties. *Id.* Management gave Walsh impossible and impractical instructions, for example by insisting that Walsh could not tell an end user "no," even though that was sometimes the accurate and necessary answer to an end user's question. Appx. 113-114. Instead, HNTB required these two employees (with over a quarter century of experience each) to tell end users that they needed to check with him. *Id.* This work environment deteriorated even further. Appx. 116. Vealey began rebuking Walsh and Allinson for working too many overtime hours, even though the PIP issued to them the prior year had emphasized the supposed importance of overtime work to their positions, claiming that no IT jobs required work of less than 40 hours per week. Appx. 116. Walsh understood that Vealey was claiming—inaccurately—that she worked too slowly. *Id.*

12

Walsh and Allinson reached a point where they could no longer withstand this work environment. *Id.* The pair submitted their resignations on September 1, 2020. App. 116, 121. Walsh's last day of work was September 11, 2020. Appx. 121. Walsh's position as a TSR had been her "dream job." Appx. 108. Walsh testified that she and Allinson "did not leave in the middle of a pandemic with very high unemployment and low prospects for the fun of it." Appx. 260. Walsh felt that she had been "forced out" of her job of 26 years through the Company's escalating, age-motivated mistreatment. Appx. 110.

## II.    RELEVANT PROCEDURAL HISTORY

HNTB removed this action from the Massachusetts Superior Court to the District Court on March 25, 2022. Appx. 3. On December 21, 2023, the District Court (Gorton, J.) granted summary judgment in favor of HNTB on all counts. Appx. 10. In its decision, the District Court found that Walsh did not establish a *prima facie* case of age discrimination, under either Massachusetts or federal law (Counts I and II), because she did not establish an "adverse action." Add. 6-7. To wit, the District Court found that Walsh failed to adduce evidence sufficient to show that she was "constructively discharged," that she was subject to a hostile work environment because of her age, or that she was subject to some other sufficiently adverse action. Add. 7-11. Having found that Walsh did not establish a *prima facie* case of discrimination, the District Court did not analyze the remainder

of the McDonnell Douglas burden-shifting framework. Add. 5; *see Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).

The District Court also granted summary judgment on Walsh's claim for breach of the implied covenant of good faith and fair dealing (Count III), which Walsh does not challenge in this appeal. *See* Add. 12.

Thereafter, this appeal ensued.

## SUMMARY OF THE ARGUMENT

This Court has jurisdiction over Walsh's appeal, first, because her initial, *pro se* request for an extension was a timely, "functional equivalent" of a Notice of Appeal containing all information required under Fed. R. App. P. 3. Specifically, Walsh's motion of January 19, 2024, in which she sought more time to file her notice of appeal, provided notice of her intent to appeal the December 21, 2023, order granting summary judgment to HNTB within the 30-day deadline set forth in Fed. R. App. P. 4 and contained the "pertinent information" specified in Rule 3. *See* Appx. 10, 13. (pp. 20-24).

Alternatively, and in any event, Walsh's appeal is timely, because the District Court acted within its discretion in extending Plaintiff's deadline to file her formal notice of appeal. Because this is not a case in which the appellant lacked notice of entry of judgment, 28 U.S.C. § 2107(c) does not limit the duration of an extension

that a district court may grant. *Hamer v. Neighborhood Hous. Servs*., 583 U.S. 17, 23-24 (2017). HNTB forfeited its objections by failing to object to Walsh's requests fo several months. Appx. 10, 16. Further, by the District Court's own admission, that Court erroneously failed to serve Walsh with its April 26, 2024, order granting an enlargement to May 10, 2024. Appx. 10-11, 31. Given Walsh's then-*pro se* status, the notice of deficiency was outside of Walsh's control, and HNTB's prolonged silence, the District Court acted within its discretion, and pursuant to its authority under Section 2107(c), in tolling Walsh's deadline to file her notice of appeal in its orders dated April 26 and May 16, 2024. It is apparent that Walsh diligently sought to appeal the Court's entry of summary judgment, and that HNTB and the Court were aware of that intention from January 19, 2024, onward. As such, the District Court acted within its authority, Walsh's notice of appeal was timely made, and this Court has jurisdiction over the appeal. *Hamer*, 583 U.S. at 20. (pp. 24-28).

This Court should reverse the grant of summary judgment on Walsh's age-discrimination claims under Massachusetts and federal law. An employee's *prima facie* case under the *McDonnell Douglas* framework is "'a small showing that . . . is easily made.'" *Kosereis v. State of Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (citations omitted).  Here, the District Court erroneously held that Walsh did not meet this modest burden based on an unduly narrow view of what constitutes

an "adverse action." The District Court's analysis on this point is at odds with

*Muldrow v. City of St. Louis*, *See* 601 U.S., 346 (2024), which was issued after the

summary judgment decision here. In the words of the Supreme Court,

"[d]iscriminate against' means treat worse . . . ." *Muldrow,* 601 U.S. at 355

(citation omitted). In this case, there is sufficient evidence, viewed in the light most

favorable to Walsh, showing that HNTB's actions were "adverse." Walsh was

denied raises for the last three years of her employment; was given a performance

improvement plan that nearly resulted in the termination of her employment but

that sharply contrasted the praise in contemporaneous performance reviews; was

yelled at repeatedly by one manager and told to "shut up" by another; was given

contradictory and, at times, impossible and humiliating instructions; was subject to

unsupported and unjust criticism of her work; was stripped of various job duties;

and was told by her manager that she and her older colleague could be replaced by

"younger, cheaper people." Appx. 112-114, 116, 121, 243, 251-252, 255, 256, 261-

264, 269. (pp.29-34).

A jury is also entitled to find that Walsh was constructively discharged.

There is sufficient evidence, viewed in the light most favorable to Walsh, from

which a jury may find that a constructive discharge indeed occurred because the

"working conditions [were] so intolerable that a reasonable person would have felt

compelled to resign." *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147

(2004); *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34 (1995). Again, the District Court's view was over-narrow. As the Second Circuit has long recognized, and as this Court should acknowledge, "the effect of a number of adverse conditions in the workplace is cumulative." *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 90 (2d Cir. 1996). Here, a jury is entitled to find that effects of the PIP did not disappear in November 2019, after which nothing material happened, but that instead, increasingly hostile actions by HNTB over the next 10 months had a cumulative effect so extreme that Walsh reasonably eventually felt compelled to resign from a position that had once been her "dream job" of a quarter century. *See* Appx. 99-100, 108 Walsh set forth sufficient evidence, viewed in the light most favorable to her from which a jury may infer the remaining criteria of her *prima facie* case. Specifically, she is over the age of 40; performed her job at an acceptable level, and the adverse actions here occurred in circumstances that raise a reasonable inference of discrimination. Indeed, as the District Court properly recognized, the "purported comment that Walsh could 'be replaced by younger, cheaper people' and that the company was 'not getting its return investment' on her may indeed evince age-related animus." Add. 10. (pp. 34-40).

Summary judgment should likewise be reversed because Defendant has failed to proffer *admissible* evidence in support of its proffered non-discriminatory rationale necessary to rebut the presumption of discrimination stemming from

17

Walsh's *prima facie* case. HNTB's position about the nature of Walsh's alleged
performance deficiencies is supported by nothing more than level upon level of
inadmissible hearsay, which is insufficient to meet its burden of production in
summary judgment. (pp. 40-43).

Finally, a jury is also entitled to find pretext. The jury may infer pretext from
evidence that HTNB's criticisms of Walsh's performance are "unworthy of
credence," *see Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000), for
example, because numerous claims in the PIP contradict Walsh's contemporaneous
performance reviews and the testimony of her supervisors. The jury may also infer
pretext from ambiguities in HNTB's criticisms, made largely without factual
support. Moreover, the jury may infer pretext because the Company's decision to
put a 25-year employee on a PIP because her office was "messy" is not credible. In
addition, evidence of mistreatment of Walsh and Allinson, on one hand, as
compared to treatment of their younger peers, the jury may once again infer
pretext. (pp. 43-49).

Last, but certainly not least, the jury is entitled to infer from the language
used by HNTB in assessing Plaintiff's performance that age bias infected its
treatment of Walsh, and in turn, caused the escalating misconduct that led to
Walsh's constructive discharge. "[U]nlawful discrimination can stem from
stereotypes and other types of cognitive biases, as well as from conscious animus."

*Thomas v. Eastman Kodak Co*., 183 F.3d 38, 59 (1st Cir. 1999). "The concept of 'stereotyping' includes . . . a host of . . . subtle cognitive phenomena which can skew perceptions and judgments." *Id.* at 61. In addition to comments about replacing Walsh with "younger, cheaper people" and Defendant "not getting its return investment," are commentary in HNTB's documentation claiming that Walsh was failing to "stretch" herself, needed to think "flexibly" and speculating (with no support) that Walsh would "struggle to maintain pace" with the business's demands. Appx. 133, 138. A jury is entitled to infer from these statements that age-based expectations of Walsh's performance infected the Company's assessment of her performance. The jury may find that David Gregory—who was 15 years younger than Walsh and rarely, if ever, worked with her—spurred an assault on Walsh's job stemming from age-based cognitive biases. In short, whether HNTB's stated reasons for subjecting Plaintiff to a PIP, ceasing providing her with pay raises as she aged, and otherwise subjecting her to escalating and disparate terms and conditions of employment are jury issues. A jury may find that HNTB sought to, and did, push Walsh out of her employment, through a continued campaign to make her uncomfortable at work, because of stereotypical beliefs tied to Walsh's age. (pp. 49-51).

19

## ARGUMENT

### I.    This Court Has Jurisdiction Over Walsh's Timely Appeal of the District Court's Grant of Summary Judgment.

"[A] provision governing the time to appeal in a civil action qualifies as jurisdictional only if Congress sets the time." *Hamer v. Neighborhood Hous. Servs.*, 583 U.S. 17, 19 (2017). Thus, an appellant's failure to file a timely notice of appeal will deprive this Court of jurisdiction only when the controlling time period is set by statute. *Id.* at 19-20. Because Walsh filed the "functional equivalent" of a Notice of Appeal, *see* Appx. 13, within the thirty (30) days of the District Court's entry of Summary Judgment, this Court need not reach the issue of whether Walsh's later filings were insufficient to confer jurisdiction on this Court.

### A.    Walsh Filed a Timely Notice of Appeal.

#### 1.    Walsh's Initial *Pro Se* Motion, Filed Within 30 Days of the Court's Summary Judgment Decision and Order, Was the "Functional Equivalent" of Notice of Appeal Sufficient to Meet Her Obligations under Fed. R. App. P. 3.

Rule 3 describes how an appeal is taken, i.e. by the filing of a notice of appeal that contains certain information. Fed. R. App. P. 3(a), (c)(1). For an "appeal as of right," like this one, an appeal is initiated by filing of a notice of appeal containing the requisite information identifying the judgment or appealable order being appealed, to what court, and by whom—within the timeframe set forth

20

in Rule 4. *Id.* When an appeal is taken by a *pro se* person, as here, the appeal is considered filed on their own behalf. Fed. R. App. P. 3(a), (c)(2).

This Court should be "solicitous of the obstacles" that *pro se* litigants like Walsh face. *Boivin v. Black*, 225 F.3d 36, 43 (1st Cir. 2000). *Pro se* litigants' pleadings must be held to a "less demanding standard[]" than those drafted by lawyers. *Id.* "[C]ourts endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." *Id.* Both the liberality to be afforded *pro se* parties and controlling case law mandate a finding that Plaintiff timely met the requirements of Fed. R. App. P. 3.

"Courts will liberally construe the requirements of Rule 3." *Smith v. Barry*, 502 U.S. 244, 248 (1992). "Thus, when papers are 'technically at variance with the letter of [Rule 3], a court may nonetheless find that the litigant has complied with the rule if the litigant's action is the functional equivalent of what the rule requires.'" *Id.*, *quoting Torres v. Oakland Scavenger Co*., 487 U.S. 312, 316 (1988). *See Campiti v. Matesanz*, 333 F.3d 317, 320 (1st Cir. 2003) (request for appointment of appellant counsel was "functional equivalent" of notice of appeal); *Cruzado v. Alves*, 89 F.4th 64, 74 (1st Cir. 2023) (motion for extension of time to file a memorandum of law in support of the issuance of a certificate of appealability was "functional equivalent" of notice of appeal). Walsh's motion of January 19, 2024, in which she sought more time to file her notice of appeal,

21

provided notice of her intent to appeal to the December 21, 2023, order granting summary judgment to HNTB within the 30-day deadline set forth in Rule 4. *See* Appx. 10, 13.

To be sure, "it is not enough under *Smith* for a filing to evidence the movant's intent to appeal. It must also contain the 'pertinent information' specified in Rule 3—namely, the information that Rule 3 provides that a notice of appeal must contain." *Cruzado*, 89 F.4th at 72, *citing Campiti*, 333 F.3d at 320. This turns on "the question of whether [the] motion . . . contained the 'pertinent information' required for a filing to be deemed the functional equivalent of a notice of appeal." *Cruzado*, 89 F.4th at 72, *citing Campiti*, 333 F.3d at 320.

In *Cruzado*, a motion for an enlargement of time was deemed sufficient to satisfy Rule 3 under relevant circumstances nearly identical to those here. *See* 333 F.3d at 72-73. First, Walsh's motion "named the parties to the appeal because it named" them in the caption. *See id.* at 72; Appx. 13. To wit, Walsh and HNTB, as plaintiff and defendant, respectively, are the only parties in the action; both are named in the caption of the January 19, 2024, motion, and there can be no doubt over who are parties to Walsh's appeal. *See Cruzado,* 333 F.3d at 72; Appx. 13. And, in any event, a *pro se* notice is understood to be filed on behalf of such *pro se* party under Fed. R. App. P. 4(c)(2).

22

Second, "although [Walsh's] motion did not name the court to which
[Walsh] intended to take [her] appeal, . . . consistent with *Smith's* instruction to
liberally construe the requirements of Rule 3, 'failures to meet this requirement are
excused where there is only one court to which the appeal can be taken.'" *See*
*Cruzado*, 89 F.4th at 72, *quoting United States v. Gooch*, 842 F.3d 1274, 1277
(D.C. Cir. 2016). As in *Cruzado* and *Campiti*, "there is no other appellate court to
which [Walsh] could have wanted to appeal" other than this Court. *See Cruzado,*
89 F.4th at 72. Therefore, "Rule 3's requirement that a notice of appeal must 'name
the court to which the appeal is taken' poses no bar to [the Court] deeming the
motion at hand the functional equivalent of a notice of appeal." *See Cruzado*, 89
F.4th at 72 (internal citation omitted). It is obvious that Walsh sought appeal to this
First Circuit court, the only appellate court to which Walsh could have any
recourse. *See id.*

Finally, "the requirement in [Fed. R. Civ. P.] 3(c)(1)(B) that the notice of
appeal must 'designate the judgment — or the appealable order — from which the
appeal is taken'" is also satisfied. *See Cruzado*, 89 F.4th at 72. While Walsh's
motion does not explicitly state that she seeks to appeal the District Court's
December 21, 2023, entry of summary judgment dismissing the case, *see* Appx.
13, this was also the case in *Cruzado*. *See* 89 F.4th at 72-73. As there, Walsh's
"motion did include the District Court docket number on its face, and the motion

23

for an extension of time was the next filing on the docket after the only substantive order by the District Court in this case—which, as it happens, was the order [that appellant sought to challenge on appeal]—and a companion order dismissing the case." *See* 89 F.4th at 73; Appx. 10, 13. As in *Cruzado*, it is therefore perfectly obvious that Walsh's January 19, 2024, motion indicated her intent to appeal the order and judgment immediately preceding it—i.e. the District Court's Memorandum and Order and the Judgment that resulted, as memorialized in the two docket entries dated December 21, 2023, immediately preceding Walsh's motion of January 19, 2024. *See id*. As here, "[i]mperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court." *See Becker v. Montgomery*, 532 U.S. 757, 759 (2001).

Having functionally notified the Court and HNTB of her intent to appeal, and in a timely manner, i.e. within 30 days of entry of judgment, and having done so in a manner that provided or otherwise made clear the information required under Rule 3, Walsh's *pro se* motion dated January 19, 2024, was the "functional equivalent" of a notice of timely appeal. *See Smith*, 502 U.S. at 248. Therefore, this Court need not reach the issue of whether the District Court had authority to enlarge Walsh's deadline to file a notice of appeal, and this appeal must proceed on the merits.

24

2. **In Any Event, the District Court Acted within Its Discretion In Enlarging the *Pro Se* Plaintiff's Time to File a Notice of Appeal.**

28 U.S.C. § 2107(c) authorizes the District Court, "upon motion filed not later than 30 days after the expiration of the time otherwise set for bringing appeal, extend the time for appeal upon a showing of excusable neglect or good cause." The "current [28 U.S.C.] § 2107(c), like the provision as initially enacted, specifies the length of an extension for cases in which the appellant lacked notice of the entry of judgment. For other cases, the statute does not say how long an extension may run." *Hamer*, 583 U.S. at 23-24. Because this is not a case in which the appellant lacked notice of entry of judgment, *see* Appx. 13, Section 2107(c) does not impose any limit on the duration of an extension. *Hamer*, 583 U.S. at 23-24. Had this been an instance in which the appellant did not know that judgment had entered against her and consequently filed a late notice of appeal,[4] with leave of court extending her deadline more than 30 days, appellant's notice of appeal would not have been timely under statute, thereby depriving *and* the appellate court of jurisdiction over such appeal. *See id.* at 25-27, *citing Bowles v. Russell*, 551 U.S. 205, 207 (2007).

The deadlines in Fed. R. App. P. 4(a)(5)(C) apply more broadly. "Unlike §2107(c), . . . Rule 4(a)(5)(C) limits extensions of time to file a notice of appeal in

---

[4]    As discussed in Part 1.A.1, *supra*, Plaintiff's January 1, 2024, filing with the District Court functioned as a *timely* notice of appeal. *See* Appx. 10.

25

all circumstances, not just in cases in which the prospective appellant lacked notice of the entry of judgment." *Hamer*, 583 U.S. at 24. However, Rule 4(a)(5)(C) is not a "jurisdictional appeal filing deadlines" but instead is a "mandatory claim-processing rule." *Hamer*, 583 U.S. at 26. In this case, because "Rule 4(a)(5)(C), not § 2107, limits the length of the extension granted here, the time prescription is not jurisdictional." *See id.* at 27.

Mandatory claim process rules are subject to forfeiture. *Fort Bend County v. Davis*, 587 U.S. 541, 549 (2019). Specifically, "an objection based on a mandatory claim-processing rule may be forfeited "if the party asserting the rule waits too long to raise the point." *Id.; see Kontrick v. Ryan*, 540 U.S. 443, 456 (2004) ("a claim-processing rule . . . even if unalterable on a party's application, can nonetheless be forfeited if the party asserting the rule waits too long to raise the point."). Here, HNTB did not file any opposition to Walsh's initial, January 19, 2024, filing. Appx. 10. Through such omission, HNTB forfeited any argument that her motion sought more time than permitted under Fed. R. App. P. 4(a)(5)(C). *See Hamer*, 583 U.S. at 20.

While HNTB took umbrage at Walsh's March 18, 2024, request in an opposition dated April 1, 2024 that discussed timeliness under Fed. R. App. P. 4(a)(5)(C), *see* Appx. 10, 16, and assuming *arguendo* that this argument could still be made, other law and circumstances permitted the Court to enter its orders here.

By the District Court's own admission, it erroneously failed to serve Walsh with its April 26, 2024, order granting an enlargement to May 10, 2024. Appx. 10-11, 31.[5] This Court should toll Fed. R. App. P. 4(a)(5)(C) under appropriate circumstances in cases, like this one, where the timeframe is not a statutory prerequisite to appellate jurisdiction, *see Hamer*, 583 U.S. at 25-27, and where a *pro se* party is erroneously relying on an omission of the District Court.

"Equitable tolling is a traditional feature of American jurisprudence and a background principle against which Congress drafts limitations periods." *Boechler, P.C. v. Commissioner*, 596 U.S. 199, 208-209 (2022). Given her then-*pro se* status, the notice of deficiency outside of her control, and HNTB's prolonged silence about Rule 4(a)(5)(C), as set forth above, the District Court acted within its discretion, and pursuant to the authority granted to it in § 2107(c), in tolling Walsh's deadline to file her notice of appeal in its orders dated April 26 and May 16, 2024. *See* Appx. 10-11, 22-23, 30-31. It is apparent that Walsh diligently sought to appeal the entry of summary judgment, and that HNTB and the Court were aware of that intention from January 19, 2023, onward. As such, the District Court acted within its authority and Walsh's notice of appeal was timely made, and therefore, this Court has jurisdiction over the appeal. *Hamer*, 583 U.S. at 20.

---

[5]    Docket Entry No. 48 shows that the Court's order dated March 13, 2024, i.e. Docket Entry No. 47, was mailed to Walsh on March 14, 2024. Appx. 10. No such docket entry memorializes mailing a copy of the Court's April 26, 2024, order, Docket Entry No. 51, to Walsh. Appx. 10-11.

II.    **This Court Should Reverse the District Court's Grant of Summary Judgment on Walsh's Age Discrimination Claims.**

    A.    **Standard of Review**

This Court reviews a "district court's grant of a motion for summary judgment de novo" and, in doing so, "construe[s] the evidence . . . 'in the light most congenial to the nonmovant,'" here, Walsh. *Wadsworth v. Nguyen*, 129 F.4th 38, 50 (1st Cir. 2025) (citations omitted). The Court "will affirm the grant of summary judgment where the record 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" *Id.* (citation omitted).

"Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question . . . ." *Blare v. Husky Injection Molding Sys. Boston*, 419 Mass. 437, 439-440 (1995) (citations omitted). "The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence, which requires the jury to weigh the credibility of conflicting explanations of the adverse hiring decision." *Id* (internal citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150 (2000), *quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986). "Thus, although the

28

court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. Finally, in summary judgment, the Court may only rely on evidence that will be admissible at trial. *Garside v. Osco Drug, Inc*., 895 F.2d 46, 50 (1st Cir. 1990).

As discussed below, disputes of material fact and evolving law undermining a now-outdated understanding of what constitutes an "adverse action" and a "constructive discharge," and what constitutes evidence of age bias, make summary judgment inappropriate and require reversal.

### B.    Genuine Issues of Material Fact Preclude Summary Judgment on Walsh's Age Discrimination Claims.

Congress enacted the ADEA to combat workplace discrimination that robs older workers of opportunity "based in large part on stereotypes unsupported by objective fact . . . ." *EEOC v. Wyoming*, 460 U.S. 226, 231 (1983), *abrogated by statute on other grounds*, 29 U.S.C. § 623(j). "In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). An employer violates the ADEA, without limitation, when it acts on the belief that "productivity and competence decline with old age." *See id.* For the reasons set forth below, a jury is entitled to find that Walsh was subject to persistent, worsening mistreatment stemming from such age-based stereotypes.

29

An employee alleging discrimination usually makes out their case with circumstantial evidence, employing iterations of the familiar *McDonnell Douglas* framework. *Adams v. Schneider Elec. USA*, 492 Mass. 271, 280 (2023) (Chapter 151B); *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 23 (1st Cir. 2015) (ADEA); *see McDonnell Douglas v. Green*, 411 U.S. 792, 802-805 (1973). "In the framework, first, the plaintiff must make out a 'prima facie case of discrimination'; second, 'the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision'; and third, the employee must provide evidence that the articulated reason is a pretext." *Adams*, 492 Mass. at 281 (citations omitted). "The *McDonnell Douglas* decision does not set out the elements of the claim or the burden of proof: it is simply 'a method of organizing evidence' 'in the context of summary judgment.'" *Id*. (citation omitted).

### 1. Viewing the Facts in the Light Most Favorable to Walsh, She Has Met Her Modest *Prima Facie* Burden.

Under Chapter 151B, a plaintiff establishes a *prima facie* case when she demonstrates that (1) she is a member of a class protected by Chapter 151B; (2) she performed her job at an acceptable level; (3) she was subject to an adverse action, and (4) the adverse action "occurred in circumstances that would raise a reasonable inference of unlawful discrimination." *See Adams*, 492 Mass. at 281, *quoting Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 41, 45 (2005). The *prima*

*facie* case is not intended to be "onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (*Burdine*); *Sullivan*, 444 Mass. at 45. Rather, it is "'a small showing that . . . is easily made.'" *Kosereis v. State of Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003), *citing Reed v. LePage Bakeries, Inc*., 244 F.3d 254, 259 (1st. Cir. 2001) *and Gillen v. Fallon Ambulance Serv., Inc*., 283 F.3d 11, 30 (1st Cir. 2002).

### a. HNTB's Actions, Taken Together, Constitute An 'Adverse Action' Under *Muldrow v. City o f St. Louis*.

In this case, the District Court's view of an "adverse action" —the third element of the *prima facie* case—was unduly narrow under both federal and Massachusetts law. *See* Add. 5-11. In *Muldrow v. City of St. Louis*, issued after the District Court's decision here, the Supreme Court clarified the expansive reach of federal anti-discrimination laws and upset decades of jurisprudence narrowly defining an "adverse action." *See* 601 U.S., 346, 352-357 (2024); Appx. 10. "'Discriminate against' means treat worse . . . ." *Muldrow,* 601 U.S. at 355, *citing Bostock v. Clayton Cnty*., 590 U.S. 644, 681 (2020). In other words, an employer may not "treat[ ] a person worse" because of a protected trait—here, age—with respect to the "terms [or] conditions" of employment. *Muldrow*, 601 U.S. at 354, *citing Bostock*, 590 U.S. at 658 *and* 42 U.S.C. § 2000e-2(a)(1); *see* 29 U.S.C. § 623(a)(1) (unlawful for an employer "to fail or refuse to hire or to discharge any individual or *otherwise discriminate* against any individual with respect to his

31

compensation, *terms, conditions, or privileges of employment*, because of such individual's age . . . .") (emphases added). To show an adverse action, the employee "must at least offer evidence of a change in the terms or conditions of his employment that left him worse off." *Rios v. Centerra Group LLC*, 106 F.4th 101, 112 (1st Cir. 2024), *citing Muldrow*, 144 S. Ct. 967, 974, 976-77.

Under Massachusetts Supreme Judicial Court (SJC) precedent, an action is "adverse" (and therefore actionable) under Chapter 151B, at a minimum, "when objective aspects of the work environment are affected." *See Yee v. Mass. State Police*, 481 Mass. 290, 297 (2019). This entails a "case by case" analysis from the point of view of a "reasonable person," recognizing that an action may be "adverse" to some employees, but not others. *Id.* at 296-298. Citing federal case law since overruled by *Muldrow*, *Yee* held that an action (there, a lateral transfer) is "adverse" when the employee "puts forward evidence of any 'objective indicator of desirability' that would 'permit a reasonable factfinder to conclude that the sought for position is materially more advantageous.'" *Yee*, 481 Mass. at 299, *quoting Beyer v. County of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008).[6]

In accordance with the Massachusetts Legislature's directive that Chapter 151B "shall be construed liberally for its purposes," *see* Mass. Gen. Laws ch. 151B, § 9, the Supreme Judicial Court historically interprets Chapter 151B *at least*

---

[6]      *Muldrow* explicitly rejected the "materiality" requirement. 601 U.S. at 353.

as broadly as the statute's federal counterparts. *See e.g., Wheatley v. Amer. Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994) (internal citations omitted). It therefore can be anticipated that the Massachusetts high court ultimately will adopt *Muldrow*'s expansive view of an "adverse action" and reject any "materiality" requirement as the Supreme Court has done. *See Yee*, 481 Mass. at 298 ("In interpreting G. L. c. 151B, we often look to case law construing the analogous Title VII of the Civil Rights Act of 1964 . . . ."); *Muldrow*, 601 U.S. at 353. Walsh submits that this Court should interpret both the ADEA and Chapter 151B under the *Muldrow* standard. In other words, Walsh experienced an "adverse action" if she was left "worse off" by her employer's conduct. *See Rios*, 106 F.4th at 112, *citing Muldrow*, 144 S. Ct. 967, 974, 976-77.

Under either approach, there is sufficient evidence, viewed in the light most favorable to Walsh, in the summary judgment record showing that the Company's actions here were "adverse." Walsh was denied raises for the last three years of her employment; was given a performance improvement plan with subjective and vague goals that nearly resulted in the termination of her employment but that sharply contrasted the praise in contemporaneous performance reviews; was told that she had barely satisfied these goals; was yelled at repeatedly by one manager and told to "shut up" by another; was given contradictory and, at times, impossible and humiliating instructions; was subject to unsupported and unjust criticism of her

work; was stripped of various job duties; and was told by her manager that she

could be replaced by "younger, cheaper people." Appx. 112-114, 116, 121, 243,

251-252, 255, 256, 261-264, 269.

> **b. The Jury Is Also Entitled to Find that HNTB Constructively Discharged Walsh by Imposing an Increasingly Hostile Work Environment that, Viewed Cumulatively, Left Walsh and Her Older Peer Feeling Like They Had No Viable Choice but to "Resign."**

A finding of "constructive discharge" is a necessary predicate to

compensation for lost wages in a case in which an employee-plaintiff has

"resigned" from employment amid a hostile work environment. *Penn. State Police*

*v. Suders*, 542 U.S. 129, 147 (2004) (*Suders*). As discussed *supra*, an "adverse

action" exists here even in the absence of a constructive discharge. That said, there

is sufficient evidence, viewed in the light most favorable to Walsh, from which a

jury may find that a constructive discharge indeed occurred because the "working

conditions [were] so intolerable that a reasonable person would have felt

compelled to resign." *See id.; GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34

(1995). "[H]arassment so intolerable as to cause a resignation may be effected

through co-worker conduct, unofficial supervisory conduct, or official company

acts." *Suders*, 542 U.S. at 148.

Here, the District Court took an over-narrow view of the evidence,

improperly looking at conduct directed at Walsh in a vacuum and failing to view

the evidence in a cumulative fashion and in the light most favorable to her as the non-moving party. *See Burns v. Johnson*, 829 F.3d 1, 5 (1st Cir. 2016). As the Second Circuit has long recognized, and as this Court should acknowledge, "the effect of a number of adverse conditions in the workplace is cumulative." *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 90 (2d Cir. 1996); *Salvi v. Suffolk County Sheriff's Dep't*, 67 Mass. App. Ct. 596, 607 (2006) (holding that there was sufficient evidence to support a jury finding of constructive discharge given "the cumulative impact of the persistent rumors regarding the plaintiff's sexual orientation" amid the "the lingering effects" of past slurs and other discriminatory conduct). "Because a reasonable person encounters life's circumstances cumulatively and not individually," it would be error to "treat the various conditions as separate and distinct rather than additive." *Chertkova,* 92 F.3d at 90. To be sure, "a constructive discharge claim can be premised on the cumulative affect [sic] of a number of adverse conditions in the workplace." *Terry v. Ashcroft*, 336 F.3d 128, 153 n.24 (2d Cir. 2003).

Here, a jury is entitled to find that effects of the PIP, which was issued in a work environment replete with age-based stereotypes and left Walsh in a state in which she had expected her imminent termination after a quarter century, did not disappear in November 2019, after which nothing material happened; instead, a jury may find increasingly hostile actions by HNTB over the next 13 months had a

cumulative effect so extreme that Walsh reasonably eventually felt compelled to resign from a position that had once been her "dream job" of two and a half decades. *See* Appx. 99-100, 108. To wit, Walsh was told in November 2019 that she "barely" got out of the PIP and, indeed, believed at the end of the PIP that she was going to be fired. Appx. 256. Over the year that followed, and against this backdrop, Walsh experienced increasing mistreatment, particularly from her own supervisor (Vealey), after the supposed expiration of the PIP. Appx. 112-114. Her boss screamed at her, gave her contradictory and at times impossible instructions, and took away her various job duties. Appx. 114. HNTB also treated Walsh in ways that a jury could reasonable believe were infantilizing, for example by prohibiting her from telling end users "no" (even when that was the answer) and, instead requiring her to tell them that she would talk to her boss. Appx. 113-114. Walsh was the frequent subject of unwarranted and disingenuous criticism, such as claims that she had been dilatory in picking up tickets that were just a few minutes old. Appx. 113. Walsh's supervisor also gave the two younger TSRs credit for her and Allinson's work, or took that credit himself. Appx. 112-113. Walsh describes these transgressions reflecting continued ageist animus as escalating over time, such that both older workers believed themselves "forced" to resign. Appx. 110. Walsh had loved her job. Appx. 108. Here, where both she and Allinson (the oldest two TSRs by some decades) both felt compelled to resign, it would be error to find

36

as a matter of a law that a "reasonable" person would not have felt the same. Appx. 110. Walsh was only getting older, and she could only expect her deteriorating work environment to degrade even further.

The cumulative effect of HNTB's escalating transgressions is a jury issue. A court analyzing a discrimination claim should not "'slice and dice' the complex phenomenon of discrimination into pieces, and evaluate each piece out of the context of the whole, the real, lived employment environment." *See Diaz v. Jiten Hotel Mgt.*, 762 F. Supp. 2d 319, 322 (D. Mass. 2011). The jury is entitled to find that Walsh's "real, lived employment environment" spiraled downward due to her age until Walsh and her older co-worker both felt compelled to resign.

### c. Walsh Establishes the First and Second Elements of a *Prima Facie* Case of Age Discrimination.

Having erroneously decided that Walsh had not established an "adverse action," the District Court here did not reach the remainder of Walsh's *prima facie* case. Add. 6-7. Plaintiff meets this modest burden, however. *See Sullivan*, 444 Mass. at 45; *Burdine*, 450 U.S. at 253. To wit, Walsh is over the age of 40. Appx. 171. Her own supervisor, Vealey, testified that she was meeting performance expectations as compared to other TSRs and that she was "competent at her job." Appx. 269, 236. Clark likewise testified that Walsh met expectations, as compared to other TSR-2's, in both 2018 and 2019. Appx. 269. Although no more than is needed to show that Plaintiff was performing at an "acceptable level," *see Adams*,

37

492 Mass. at 281, Walsh's performance reviews contain effusive praise—for example, Walsh's "determination, "depth of knowledge," "diligence," "[a]ccuracy and timeliness," and "tremendous passion for running the shop"—from which a jury may likewise infer that Walsh was meeting HNTB's lawful expectations (and more). Appx. 133-136. While HNTB may put forth, or attempt to put forth, evidence to the contrary, given the testimony of supervisors Vealey and Clark, this Court may not engage in credibility determinations but must reserve any factual dispute on this point for the jury. *Reeves*, 530 U.S. at 142; *Adams*, 492 Mass. at 289. That Walsh is described by her direct supervisor and dotted-line supervisor as meeting expectations is sufficient to meet her burden to show that she was performing her job at an acceptable level. *See Adams*, 492 Mass. at 281.

> **d.  Finally, a Jury is Entitled to Find that the Adverse Actions Here Occurred in Circumstances That Would Raise a Reasonable Inference of Unlawful Discrimination.**

As the District Court properly recognized, "Vealey's purported comment that Walsh could 'be replaced by younger, cheaper people' and that the company was 'not getting its return investment' on her may indeed evince age-related animus." Add. 10; *see Rose v. New York City Bd. of Educ*., 257 F.3d 156, 159, 162 (2d Cir. 2001) (a supervisor's remarks that an employee-plaintiff could be placed by a "younger and cheaper" worker are "direct evidence" from which a jury may infer age-based, discriminatory animus). To be sure, "evidence of age-related comments

could support an inference of pretext and discriminatory animus." *Dominguez-Cruz v. Suttle Caribe, Inc*., 202 F.3d 424, 433 (1st Cir. 2000). As the Massachusetts SJC recognized, "*any* ageist, sexist, or racist remarks by those involved in the decisional process may be considered probative of discrimination against a particular plaintiff." *Adams*, 492 Mass. at 283 n.7 (emphasis added).

Moreover, Walsh's performance reviews and the PIP also include numerous statements from which the jury may infer that age bias infected HNTB's treatment of Walsh—for example, the claim that Walsh "lack of initiative to stretch," that Walsh's team needed to think "creatively" and "flexibly," and that Walsh was at risk of "struggl[ing] to maintain pace" with the business's demands, and that she needed to "stretch beyond the status quo . . . ." Appx. 118, 143; *see Flanagan v. City of Lawrence Sch. Dept*., No. 03-BEM-02592, 2010 Mass. Comm. Discrim. LEXIS 6, *5 (Mass. Comm'n Against Discrimination March 24, 2010) ("Hearing Officer properly concluded that age was a determinative factor in the hiring decision, based in part on the principal's use of the terms 'energetic' and 'flexible' to describe his ideal candidate"); *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 147 (D.C. Dist. Ct. 2016) ("The comments that Conn 'had been in her job too long to adapt to change' and 'would slow us down' if given back her former assignments may well have been innocuous . . . But they could also reflect 'the sort of 'inaccurate and stigmatizing stereotypes' that led Congress to enact the

ADEA."). Of note, much of these criticisms contradicted praise in Walsh's recent

performance review,[7] and these critiques are largely, if not entirely, unsupported by

concrete examples. *See* Appx. 118-119, 133-139. The jury may find that these

statements by Clark (who was 25 years younger than Walsh) reflect the "inaccurate

and stigmatizing stereotypes" that the ADEA was intended to prohibit employers

from acting on. *See Hazen Paper*, 507 U.S. at 610. While the jury may ultimately

decide otherwise, "the task of disambiguating ambiguous utterances is for trial, not

for summary judgment." *See Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.

1990) ("On a motion for summary judgment the ambiguities in a witness's

testimony must be resolved against the moving party."). It is not for this Court to

decide whether, and to what extent, these remarks evince age bias; these are jury

issues. As such, Walsh has satisfied all elements of the "modest" showing required

to establish her *prima facie* case. *See Soto-Feliciano*, 779 F.3d at 23.

### 2. Because HNTB's Proffered Legitimate, Non-Discriminatory Reason Is Unsupported by *Admissible* Evidence, But Instead Relies Merely on Layers of Inadmissible Hearsay, the Company has Failed to Meet Its Burden to Overcome the Presumption of Walsh's *Prima Facie* Case.

A plaintiff who, as here, meets the "'low standard of showing prima facie

discrimination,' . . . 'in effect creates a presumption that the employer unlawfully

---

[7]    For more fulsome discussion, *see* Part II.B.3, *infra*, discussing evidence of pretext, including contradictions between the criticism in the PIP and Walsh's performance reviews.

discriminated against the employee[.]'" *Soto-Feliciano*, 779 F.3d at 23, *quoting Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). "In consequence of that presumption, at the second stage of the inquiry, the burden of production shifts to the employer, who must then 'articulate a legitimate nondiscriminatory reason' for having taken the adverse employment action." *Soto-Feliciano*, 779 F.3d at 23, *quoting Zapata-Matos*, 277 F.3d at 44; *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 397 (2016). "[T[he defendant's explanation of its legitimate reasons must be clear and reasonably specific." *Burdine*, 450 U.S. at 258.

This second step of the *McDonnell Douglas* framework requires the defendant-employer to "clearly set forth, *through the introduction of admissible evidence*, the reasons for the plaintiff's rejection . . . sufficient . . . [to] raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 255 (emphasis added); *see Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998) ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision."). Indeed, in summary judgment, the Court may rely only on admissible evidence, and not on hearsay. *Garside*, 895 F.2d at 50.

41

With respect to the PIP, the Company articulates a proffered non-discriminatory reason but fails to support that reason with *admissible* evidence. HNTB alleges that the PIP, which was drafted and signed by Clark,[8] stemmed from concerns levied by two executives, Brake and Bua, that "they were not getting what they needed from [Walsh] in terms of either responsiveness or technology they were needing" and that she was, "generally . . . getting in the way of what they needed." Appx. 88, 119, 272-273. Not only does the summary judgment record fail to provide any example of these vaguely articulated, alleged deficiencies, the record also contains no testimony of, or admissible business record authored by, either Brake or Bua. HNTB also claims that Gregory made the decision to issue Walsh the PIP, based on Brake's and Bua's supposed feedback, but the record likewise contains no testimony from Gregory, nor any admissible business record authored by him, setting forth Gregory's personal knowledge of the deficiencies HNTB alleges. As such, HNTB's position about the nature of Walsh's alleged performance deficiencies is supported by nothing more than inadmissible hearsay-upon-hearsay for which there are no applicable exceptions and which is insufficient to meet HNTB's burden of production in summary judgment. *Burdine*, 450 U.S. at 255; *Garside*, 895 F.2d at 50. For this reason, the

---

[8]     Clark testified that, in his view, Walsh met expectations, as compared to other TSR-2's, in both 2018 and 2019, and that the decision to issue the PIP to Walsh was made by Gregory. Appx. 269-272.

Court need not continue its analysis of the *McDonnell Douglas* framework, but instead may reverse the decision of the District Court.

### 3.  In Any Event, A Jury Is Entitled to Find Pretext.

In instances where the employer meets its burden in the second stage of the *McDonnell Douglas* framework—which Walsh submits that HNTB has not done—the burden then shifts back to the employee for the final stage of the inquiry. *Soto-Feliciano*, 779 F.3d at 23. Under federal law, this requires the plaintiff to 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (citation omitted). This does not require Walsh to prove her case, but only to show that her "ability to meet [her] burden turns on a genuine issue of material fact." *Taite v. Bridgewater State Univ., Bd. of Trustees*, 999 F.3d 86, 94 (1st Cir. 2021), *quoting Soto-Feliciano*, 779 F.3d at 23. "[W]here a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens v. General Dynamics Corp*., 144 F.3d 151, 167 (1st Cir. 1998) (citation omitted)

Under Chapter 151B, a plaintiff's burden in this third and final stage is even more modest; Massachusetts is a "pretext only jurisdiction," thereby requiring only

43

a showing of pretext. *Verdrager*, 474 Mass. at 397. Thus, under Chapter 151B, "an employee may survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against him [or her] were not the real reasons for that action,' . . . even if that evidence does not show directly that the true reasons were, in fact, discriminatory." *Id.* (citations omitted). Here, the plaintiff has the burden of *production*, but the burden of *persuasion* remains with the employer-defendant as the moving party. *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 683 (2016). The jury is entitled to infer discriminatory intent if it finds that *just one* of the employer's stated reasons is false. *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 501 (2001).

### a. HNTB's Criticisms of Walsh Are Rife with Indicia of Pretext.

A jury may infer pretext from the employer's proffered, legitimate and nondiscriminatory rationale in numerous ways. There are numerous indicia of pretext here, to wit:

### i. The Jury May Infer Pretext from Evidence That HNTB's Explanations Are Inconsistent, Contradicted, and "Unworthy of Credence."

"Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." *Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000), *quoting Reeves*, 530 U.S. at 147. Similarly, the jury may infer pretext when an employer's explanations

are "arguably inconsistent." *Dominguez-Cruz*, 202 F.3d at 433. Both are present here. To wit, the PIP makes various claims that a jury may find are contracted by, and inconsistent with, other contemporaneous assessments of Plaintiff's performance. For example, the PIP claims that "[t]he office sees . . . [Walsh] as pushing back on suggestions/ideas and unwilling to look for solutions before saying something can't be done." Appx. 118. It also avers that Walsh did not "adequately represent the customer service focus that is critical to the success" of her position. Appx. 118. The PIP also lamented that unspecified "[o]ffice staff" perceived Walsh as "hid[ing] in the IT room. *Id.*

Walsh's review for 2019, which covers the period for which the PIP was issued, provides a very different take on these aspects of Walsh's performance. Appx. 143. There, Vealey praised Walsh as "not afraid to pursue answers to technical issues on her own or through communication with others." *Id.* Similarly, in her review for 2018, which was issued about four months before the PIP, Clark wrote that, "Persistence is perhaps her greatest attribute. She always seeks the right answer to be successful in accomplishing any task" and adds that Walsh is "[a]lways adaptable," never shy to solicit help or feedback" and "[a]lways creative." Appx. 133-136, 182. Vealey also praised Walsh there for providing "a consistent level of service to local offices" and lauds her as "[d]ependable and trustworthy." Appx. 134.

45

The comment that Walsh would "hide" in the IT room is particularly odd, since Walsh provided support to HNTB staff located throughout the Northeast. Appx. 101-104. Plainly, Walsh's duties required her to work on her computer and to communicate by phone and other remote means. Id. A jury is entitled to find that Walsh's presence in her office for most of that work was therefore a necessary component of her job and, in turn, to belief this allegation was likewise "unworthy of credence." *See Reeves*, 530 U.S. at 147.

To be sure, Vealey and Clark had far more opportunity than Gregory or the other executives allegedly criticizing her to observe Walsh. Appx. 271. Both testified that Walsh was indeed meeting expectations for her role. Appx. 149, 236. In light of any, some, or all of this evidence, a jury is entitled to disbelieve HNTB's position.

### ii.    The Jury May Infer Pretext from Ambiguities HNTB's Stated Rationale.

A jury may also infer pretext from an employer's ambiguity in stating its proffered non-discriminatory rationale. *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 222 (1st Cir. 2016) (where employer claimed that employee "made a material mistake" but "never explained what this 'material mistake' was" that "ambiguity reinforces the impression that [the employer's] reasons for terminating [the employee] may have been pretextual."). The PIP contains numerous vague and conclusory assertions, largely without any factual allegations supporting them, and

46

when Walsh asked for examples, her request was refused and she was told to "shut up" and stop asking. Appx 118, 255. The PIP claims, for example, that Walsh was perceived by "[t]he office" as "contentious," that unspecified staff "feel[] that you often 'hide' in the IT room," and that Walsh was providing inadequate customer support, but no examples of these alleged deficiencies are provided. Appx. 118.

### iii. The Jury May Reason That Subjecting a 25-Year Employee to a PIP For a "Messy" Office Does Not Pass the "Straight-Faced Test."

The only allegation in the PIP supported by any specific factual allegations, either in the document itself or elsewhere in the summary judgment record, is the claim that the IT office was "cluttered" and "messy." Appx. 118. There is no evidence in the summary judgment record that Walsh was ever asked to clean up the office area prior to the PIP, and indeed, no such criticism is made in her performance review issued just months earlier. Appx. 133-139. No employer policy in the record requires employees to have a "neat" work area. Here, a jury may surmise that subjecting a 25-year employee to a PIP because her work area was "messy" was a disingenuous reaction designed to justify discipline. Such an overreaction can be probative of pretext. *Kelley v. Correctional Med. Servs.*, 707 F.3d 108, 118 (1st Cir. 2013) ("a reasonable factfinder could find that Kesteloot's action against Kelley was 'a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the ADA . . . .'"); *see also*

47

*Stalter v. Wal-Mart Stores, Inc*., 195 F.3d 285, 290 (7th Cir. 1999) ("More

compelling is the severity of the punishment in relation to the alleged offense. It

bears repeating that Stalter ate a handful of chips belonging to an employee who

considered the incident 'no big deal' and conveyed that sentiment to the company

as well as to Stalter. This strikes us as swatting a fly with a sledge hammer. That

Wal-Mart felt compelled to terminate Stalter for this offense does not pass the

straight-face test . . . ."); *Holsum De P.R., Inc. v. Nat'l Labor Relations Bd.*, 456

F.3d 265, 271 (1st Cir. 2006) (finding evidence of pretext supporting National

Labor Relations Act retaliation claim where, without limitation, "[t]here was no

evidence that any previously-terminated employee had been guilty of such an

insubstantial violation of the policy against unauthorized passengers"); *Forsythe v.

Wayfair Inc.*, 27 F.4th 67, 81 (1st Cir. 2022) (reasonable jury could find pretext as

defendant's claim that it had accepted plaintiff's offer to resign when had only

expressed interest in a severance package was unlikely and employer probably did

not believe its own justification).

> **iv.    The Jury May Infer Pretext from HNTB's
> Mistreatment of Walsh and Allinson, On One Hand,
> and the Preferential Treatment Afforded the Two
> Younger TSR's, On the Other Hand.**

Negative treatment of other older employees may indicate pretext. *Knight v.

Avon Prods., Inc*., 438 Mass. 413, 426 n.9 (2003) (evidence of pretext "might be

that a plaintiff was the oldest employee at a company and the only one not offered

a transfer or that other employees of the plaintiff's age were terminated at the same time."). Likewise, preferential treatment afforded to employees outside of the plaintiff's protected class—here, younger workers—may show pretext. *Bulwer*, 473 Mass. at 685. Vealey repeatedly screamed at Walsh and Allinson; gave DeMarinis and Cordero credit for the two older employees' work; and lobbed disingenuous, unfair and contradictory criticism at Walsh and Allinson. Appx. 112-116. From such evidence of mistreatment of Walsh and Allinson, on one hand, as compared to his treatment of the younger TSR's, DeMarinis and Cordero, on the other hand, the jury may once again infer pretext. *See Bulwer*, 672 Mass. at 685; *Knight*, 438 Mass. at 426 n.9. That Walsh and Allinson were put on "virtually identical" PIPs on the same time, Appx. 231, 273-274, similarly indicates pretext. *See Knight*, 438 Mass. at 426 n.9*; Holsum*, 456 F.3d at 271 (1st Cir. 2006) (claim of anti-union animus supported by termination of a second union organizer at around the same time as plaintiff).

> ### b. A Jury Is Entitled to Infer Age Bias From References To "Younger, Cheaper" Workers, HNTB's Claims That Was Walsh Was Not "Flexible" In Her Thinking and Struggled To "Maintain Pace" With HNTB's Business Demands, and Similar Commentary Evincing Age-Based Biases.

Last, but certainly not least, the jury is entitled to infer from the language used by HNTB in assessing Plaintiff's performance that age bias infected Defendant's mistreatment of Walsh, and in turn, caused the escalating mistreatment

that ultimately led to Walsh and Allinson deciding that they had no viable choice but to leave HNTB. *See* Appx. 110. "[U]nlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999). "The concept of 'stereotyping' includes . . . a host of . . . subtle cognitive phenomena which can skew perceptions and judgments." *Id.* at 61; *see also Dominguez-Cruz*, 202 F.3d at 433 (age-related comments may support a jury finding of pretext). Here, the record is rife with statements made by individuals involved in the decisionmaking and in setting the "corporate strategy" from which the jury may infer bias. *See Adams*, 492 Mass. at 283 (discussing evidence of employer's ageist "corporate strategy"). Walsh makes this argument last, not because it lacks import, but because it is a critical point that is best considered through the lens of the harshness of HNTB's conduct and the numerous ways that a jury may infer pretext based on the sharp contrast between the PIP and the sometimes effusive praise of Walsh's abilities.

As the District Court correctly recognized, Vealey's comments about replacing Walsh with "younger, cheaper people" and that Defendant was "not getting its return investment" on Walsh are evidence of age bias. Add. 10. Indeed, they are. *See Rose*, 257 F.3d at 159, 162. But there is more. HNTB's documentation claimed that Walsh was failing to "stretch" herself, opined Walsh needed to think "flexibly" and speculated (with no factual support) that she would

"struggle to maintain pace" with the business's demands. Appx. 133, 138. As noted above, HTNB's emphasis on Walsh's perceived inflexibility and inability to keep pace reflect obvious stereotypes permeated with ageist bias of older workers as slow and rigid. *See* Part II.B.1.d, *supra.* A jury is entitled to infer from these statements that age-based presuppositions infected the Company's assessment of her performance. The jury may surmise that the reason for the disconnect between the sometimes effusive praise of Walsh's abilities, on one hand, and comments that she fails to "stretch herself" and unsupported speculation that she may "struggle to maintain pace," on the other hand, is age bias. The jury may find that Gregory— who was 15 years younger than Walsh and rarely, if ever, worked with her— spurred an assault on Walsh's job stemming from age-based cognitive biases when he initiated the PIP. *See Thomas*, 183 F.3d at 38. Such a "corporate strategy" of favoring younger workers over older ones is among the evils that Chapter 151B prohibits. *Adams*, 492 Mass. at 283-291.

In sum, whether HNTB's stated reasons for subjecting Plaintiff to a PIP, ceasing to provide her with pay raises commensurate with her performance as she aged, and otherwise subjecting her to disparate terms and conditions of employment present a jury issue. A jury could find that HNTB sought to push Walsh out of her employment, through a continued campaign to make her uncomfortable at work, because of stereotypical beliefs tied to Walsh's age. To be

sure, "subjective evaluations may be susceptible to manipulation and can mask discrimination." *Greene v. Walgreen E. Co*., No. 16-2487, 2018 U.S. App. LEXIS 37105, at *14 (1st Cir. Nov. 15, 2018). The jury also may find that this age-motivated campaign succeeded, ultimately resulting in Walsh's constructive discharge.

## CONCLUSION/RELIEF SOUGHT

Because genuine issues of material fact exist as to whether HNTB discriminated against Plaintiff Joanne Walsh because of her age, Walsh is entitled to a trial on Counts I and II. As such, Walsh respectfully requests that this Court reverse and vacate the District Court's order granting summary judgment on her discrimination claims and remand this matter for trial. Pursuant to 29 U.S.C. § 216(b) and Mass. Gen. Laws ch. 151B, § 9, Walsh also requests an award of attorneys' fees and costs in prosecuting her appeal.

Respectfully Submitted,
Joanne Walsh, Appellant,
By Her Attorneys,


/s/ Michaela C. May
Michaela C. May (1st Cir. Bar #1152971)
Zachary H. Hammond (1st Cir. Bar #1199716)
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
T: (617) 577-8800 x211
F: (617) 577-8811
mmay@bennettandbelfort.com
zhammond@benenttandbelfort.com

Date: September 3, 2025


## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of Fed R. App. P. 28.1(e)(2)(B)(i) because this brief contains 12,699 words. This brief complies with the typeface requirements of Fed. R. App P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because I have prepared this brief in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date:  September 3, 2025          /s/ Michaela C. May
                                 Michaela C. May

**CERTIFICATE OF SERVICE**

I hereby certify that this Plaintiff-Appellant's Brief and Addendum, filed through the PACER/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date:  September 3, 2025          */s/ Michaela C. May*
                                 Michaela C. May

No. 24-1499

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

JOANNE WALSH,
*Plaintiff-Appellant*,

*v.*

HNTB CORP.,
*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
Case No. 1:22-CV-10453-NMG

**ADDENDUM OF APPELLANT JOANNE WALSH**

Michaela C. May (1st Cir. Bar #1152971)
Zachary H. Hammond (1st Cir. Bar #1199716)
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
T: (617) 577-8800 x211
F: (617) 577-8811
mmay@bennettandbelfort.com
zhammond@benenttandbelfort.com

## TABLE OF CONTENTS

Contents.................................................................................................ADD ii


**Orders of the District Court**

Memorandum & Order (dated 12/21/2023)......................................................... ADD 1

Judgment (dated 12/21/2023) ......................................................................... ADD 13


**Orders of the U.S. Court of Appeals for the First Circuit**

Order to Show Cause (dated 7/11/2024)......................................................... ADD 14

Order (dated 6/3/2025)................................................................................. ADD 16


**Statutes**

28 U.S.C. § 2107.......................................................................................ADD 17

29 U.S.C. § 623 .........................................................................................ADD 19

Mass. Gen. Laws ch. 151B, § 4(1B).............................................................ADD 29


**Rules**

Fed. R. App. P. 3.......................................................................................ADD 31

Fed. R. App. P. 4.......................................................................................ADD 33

**United States District Court**

**District of Massachusetts**

```
_____  )
                                      )
Joanne Walsh,                         )
                                      )
            Plaintiff,                )
                                      )
        v.                            )    Civil Action No.
                                      )    22-10453-NMG
HNTB Corporation,                     )
                                      )
            Defendant.                )
_____  )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This case arises from allegations that defendant, HNTB Corporation ("HNTB" or "defendant") constructively terminated plaintiff, Joanne Walsh ("Walsh" or "plaintiff"), because of her age in violation of both the Age Discrimination in Employment Act, 29 U.S.C. § 621-34 ("ADEA") and M.G.L. c. 151B, § 4.  Walsh also claims a breach of the covenant of good faith and fair dealing.

Pending before the Court is defendant's motion for summary judgment (Docket No. 34).  For the reasons that follow, the motion will be allowed.

## I. __Background__

Walsh was employed at HNTB from January, 1994 until she
resigned in September, 2020 at the age of 55.  She maintains,
and her employer vigorously denies, that her resignation
resulted from a constructive discharge.  Her employment as a
Technology Support Representative II involved a range of IT
support functions for HNTB customers.  Walsh was purportedly
content with her position and did not seek promotion to the next
level of Technology Support Representative III.

The events leading to Walsh's resignation began when Walsh
received her 2018 performance review which stated that she "met
expectations" but "at the lowest in the range."  Her 2019
performance review reported that she "inconsistently met
expectations."  In August, 2019, Walsh was placed on a
Performance Improvement Plan ("PIP") purportedly to improve
issues concerning "responsiveness, pushback, upkeep of the
technical room, and lease returns."  Walsh maintains that she
was placed on a PIP to force her to resign because of her age.

The PIP term was 90 days and ended in November, 2019. While
the parties dispute the precise dates, at about that time Danny
Vealey ("Vealey") became Walsh's supervisor, replacing her
former supervisor, James Clark ("Clark").  Vealey worked with
Walsh throughout the PIP period and was satisfied that she met
the goals of that program.

After completion of the PIP, Walsh remained in her same position with the same pay but the parties dispute whether she retained the same job responsibilities.  Plaintiff asserts that Clark reported that she "barely improved enough to get off the PIP."

In September, 2020, Walsh resigned from HNTB.  Defendant maintains that Walsh was not about to be terminated but she insists she was being pushed out.  Her colleague with the same job title, Lindsay Allinson, also resigned on the same day. Allinson was then 62 years old.

Walsh's departure created an immediate vacancy.  According to plaintiff, an individual in his 30s was scheduled to replace her but ultimately, her job was filled by Amr Kaliouby who, at the time, was 53 years old.

Walsh contends that during the period leading up to her resignation, management made her life difficult and she felt she had no choice but to resign.  One year and five months later, plaintiff filed the instant suit alleging that she was constructively terminated on the basis of her age in violation of federal and state law.

ADD 3

## II.  **Motion for Summary Judgment**

### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law[.]" <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is

ADD 4

appropriate if, after viewing the record in the non-moving
party's favor, the Court determines that no genuine issue of
material fact exists and that the moving party is entitled to
judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

### B. Analysis

#### 1. Federal and State Claims of Age Discrimination

Discrimination based on age is impermissible under both
ADEA and M.G.L. c. 151B, § 4.  The standards applied for age
discrimination claims under federal law and Massachusetts state
law are so similar that both claims can be analyzed together.
Tombeno v. FedEx Corp. Servs., Inc., 284 F.Supp.3d 80, 86 (D.
Mass. 2018) (citing Adamson v. Walgreens Co., 750 F.3d 73, 78
(1st Cir. 2014)).

Where, as here, an employee lacks direct evidence that an
employer's actions were motivated by animus, courts apply the
burden-shifting framework outlined in McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973). See Haddad v. Wal-Mart Stores, Inc.,
914 N.E.2d 59, 66 (Mass. 2009) (citing McDonnell Douglas Corp.,
411 U.S. at 802).

Under that framework, 1) plaintiff must establish a prima
facie case of discrimination, 2) defendant may rebut that case
by offering a legitimate, nondiscriminatory reason for its
employment action, which would then require plaintiff 3) to
produce evidence demonstrating that defendant's stated reason

ADD 5

was a pretext. <u>Haddad</u>, 914 N.E.2d at 66 n.14; <u>Ingram</u> v. <u>Brink's,</u>
<u>Inc.</u>, 414 F.3d 222, 230 (1st Cir. 2005).

To establish a prima facie case of discrimination,
plaintiff must demonstrate that

> (1) [she is] a member of a protected class; (2) [she
> is] qualified for [her] job; (3) [she] suffer[ed] an
> adverse employment action at the hands of [her]
> employer; and (4) [there is] some evidence of a causal
> connection between [her] membership in a protected
> class and the adverse employment action.

<u>Garmon</u> v. <u>Nat'l R.R. Passenger Corp.</u>, 844 F.3d 307, 313 (1st
Cir. 2016) (quoting <u>Bhatti</u> v. <u>Trs. of Bos. Univ.</u>, 659 F.3d 64,
70 (1st Cir. 2011)).

Once a prima facie case has been stated, the burden shifts
to defendant to rebut the presumption of discrimination by
offering a legitimate, nondiscriminatory reason for its
employment action. <u>See</u> <u>Blare</u> v. <u>Husky Injection Molding Sys.</u>
<u>Boston</u>, 646 N.E.2d 111, 115 (1995). If defendant does so,
plaintiff must then adduce evidence demonstrating that
defendant's stated reason was pretextual. <u>Id.</u> at 116-17.

Defendant asserts that plaintiff cannot state a prima facie
case because 1) she was performing below expectations 2) she did
not suffer an adverse employment action but, rather, resigned
and 3) her position was ultimately filled by someone similar in
age.  Because the Court agrees that plaintiff did not suffer an
adverse employment action, it finds that plaintiff has not

stated a prima facie case and will, for the following reasons, allow summary judgment for defendant.

The parties do not dispute that on September 11, 2020, Walsh resigned from her position at HNTB. Plaintiff contends, however, that her resignation resulted from a constructive discharge because 1) she was relieved of certain duties 2) the workplace environment was intolerable and 3) she would have been terminated anyway.

To establish a claim of constructive discharge, plaintiff must demonstrate that

> conditions were so intolerable that they rendered a
> seemingly voluntary resignation a termination.

Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008). In its inquiry, this Court must assess whether the working conditions were

> so onerous, abusive, or unpleasant that a reasonable
> person in the employee's position would have felt
> compelled to resign.

Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). It is insufficient to show merely that a plaintiff "suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Torrech-Hernandez, 519 F.3d at 50.

The First Circuit Court of Appeals ("the First Circuit") has also endorsed the doctrine that constructive discharge can be proved by demonstrating that an employer has acted in a

ADD 7

manner that signals to a reasonable employee that she will be terminated. <u>Rivera-Rivera</u> v. <u>Medina & Medina, Inc.</u>, 898 F.3d 77, 96-97 (1st Cir. 2018).  Thus, if an employee is "told <u>repeatedly</u> that she is not wanted and has no future" with the organization, the Court can infer a constructive discharge. <u>Id.</u> (emphasis in original).

### a. Demotion

Defendant maintains that plaintiff was never demoted nor were her pay or responsibilities reduced.

Plaintiff agrees that her pay was not reduced and she was not formally demoted but asserts that her team leader and later manager, Vealey, relieved her of several job duties that she had performed throughout her career.

Walsh cites her deposition in which she attested that Vealey "started taking over things that we were working on...[h]e made it look like he was in charge" but neglects to finish the quote which also states, "if a project started to go sideways, all of a sudden it was back in our lap."  That testimony undermines the assertion that plaintiff's responsibilities were reduced.

Plaintiff also asserts that she was required to refer some customer issues to Vealey, but such a minor shift in oversight does not amount to constructive discharge.  As the First Circuit has explained,

> [a] reduction in responsibility...unaccompanied by
> diminution of salary or some other marked lessening of
> the quality of working conditions

is not a constructive discharge. <u>Suarez</u>, 229 F.3d at 55.

### b. Hostile Work Environment

Walsh also contends that she was constructively discharged as a result of an abusive workplace environment. As evidence, she cites: 1) comments by Vealey that she could "be replaced by younger, cheaper people" and that the company was "not getting its return investment" on her, 2) Clark refused to provide her with information on why her performance was purportedly lackluster and later told her to "shut up" and "stop asking" and 3) Clark told her that "she barely improved enough to get off the PIP."

HNTB responds that Walsh's evidence amounts to stray comments and, in any event, occurred 10 months or more prior to her resignation.

To establish a claim of constructive discharge plaintiff needs to adduce evidence of conditions "so onerous, abusive, or unpleasant" that a reasonable person would have felt compelled to resign. The Court notes that there is conflicting evidence as to when Vealey and Clark actually supervised plaintiff but, even attributing the offending remarks to her supervisor at the time, she has not supported a claim for constructive discharge

on the theory of a hostile workplace based on the current record.

Vealey's purported comment that Walsh could "be replaced by younger, cheaper people" and that the company was "not getting its return investment" on her may indeed evince age-related animus. Clark's comments, which included telling plaintiff to "shut up", were certainly rude, intended to reflect frustration with Walsh and could be interpreted as contributing to establish a hostile workplace.

The fact that these comments were made 10 months or more prior to plaintiff's decision to resign, however, severely undermines plaintiff's assertion that the workplace environment was so hostile that she has "no real choice but to resign." Suarez, 229 F.3d at 56. The temporal distance between those comments and the date of plaintiff's resignation suggests that plaintiff had the choice to resign and chose to stay. See Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) ("If a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged.").

### c. Termination

Finally, the First Circuit has recognized that constructive discharge claims can be established by demonstrating that plaintiff would have been discharged had she not resigned.

Here, there is no genuine question of material fact that Walsh's employment was not in imminent jeopardy.

The parties agree that Walsh was never expressly told or asked to leave HNTB.  Furthermore, the evidence establishes that plaintiff's remedial PIP period ended more than 10 months before she resigned.  The lapse of time between the bulk of the disparaging comments made to her and the date of her resignation seriously impairs her claim.  That plaintiff successfully completed the remedial process with her job intact also suggests that her job security was not immediately threatened. She definitely was not "told repeatedly that she is not wanted and has no future." See Rivera-Rivera, 898 F.3d at 97 (emphasis in original).

The Court concludes that there is no credible evidence that plaintiff was constructively terminated.  Because she has not demonstrated that she suffered an adverse action at the hands of HNTB, Walsh cannot state a prima facie case for age-discrimination.[1]  Summary judgment on the claims pursuant to ADEA and M.G.L. c. 151B, § 4 will be granted to defendant.

---

[1] This Court is unpersuaded by plaintiff's argument that her placement on a PIP was an adverse employment action.  Walsh successfully completed the PIP period and thereafter she was neither demoted nor her pay reduced and any changes in her responsibilities were de minimis.

### 2. Breach of Implied Covenant of Good Faith

Finally, defendant moves for summary judgment on plaintiff's claim for breach of the implied covenant of good faith and fair dealing. This Court's conclusion that plaintiff was not constructively terminated vitiates any such claim. See McCone v. New England Telephone and Telegraph Co., 471 N.E.2d 47, 49 n.7 (Mass. 1984).

Furthermore, the exclusivity provision in Chapter 151B casts significant doubt as to plaintiff's ability to bring a common law claim for a purportedly discriminatory termination. See M.G.L. c. 151B, § 9 ("[A]s to acts declared unlawful by section 4, the administrative procedure provided in this chapter, shall, while pending, be exclusive"); see also Laureano v. Legal Sea Foods, LLC, 2013 WL 5587949, at *3 (D. Mass. Oct. 9, 2013). Accordingly, summary judgment will be entered for defendant.

### ORDER

For the foregoing reasons, the motion of defendant, HNTB Corporation, for summary judgment (Docket No. 34) is, as to all counts, **ALLOWED.**

**So ordered.**

                                        /s/ Nathaniel M. Gorton
                                        Nathaniel M. Gorton
                                        United States District Judge


Dated:  December 21, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**JOANNE WALSH**

               Plaintiff(s)

     v.                              CIVIL ACTION NO. **22-10453-NMG**

**HNTB CORPORATION**

               Defendant(s)

**JUDGMENT IN A CIVIL CASE**

GORTON, D.J.

☐   **Jury Verdict.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

X   **Decision by the Court**. In accordance with the Memorandum and Order dated December 21, 2023, D. 44, granting defendant's Motion for Summary Judgment;

       **IT IS  ORDERED AND ADJUDGED**

       Judgment for the defendant HNTB Corporation.

                                       Robert M. Farrell, Clerk

Dated:  December 21, 2023                       /s/ Haley Currie
                                          ( By )  Deputy Clerk

# United States Court of Appeals
## For the First Circuit

_____

No. 24-1499

JOANNE WALSH,

Plaintiff - Appellant,

v.

HNTB CORPORATION,

Defendant - Appellee.

_____

**ORDER OF COURT**

Entered: July 11, 2024
Pursuant to 1st Cir. R. 27.0(d)

Appellant filed a notice of appeal on May 18, 2024 from the orders entered on December 21, 2024 (D.E. 44 and 45) in Civil Action No. 1:22-cv-10453-NMG (D. Mass.). Upon review of the record in this case, it appears that this appeal should be dismissed as untimely. See 28 U.S.C. §2107(a); Fed. R. App. P. 4(a)(1)(a) (notice of appeal in civil case must be filed within thirty days after judgment or order appealed from). Although the district court entered orders on March 13, 2024; April 26, 2024; May 16, 2024; and May 17, 2024, purporting to extend the time to file an appeal, it does not appear that the district court had authority to do so. See Fed. R. App. P. 4(a)(5)(C) ("[n]o extension under Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later"); 28 U.S.C. § 2107(c) ("The district court may, upon motion filed not later than 30 days after the expiration of the time otherwise set for bringing appeal, extend the time for appeal upon a showing of excusable neglect or good cause. In addition, if the district court finds--(1) that a party entitled to notice of the entry of a judgment or order did not receive such notice from the clerk or any party within 21 days of its entry, and (2) that no party would be prejudiced, the district court may, upon motion filed within 180 days after entry of the judgment or order or within 14 days after receipt of such notice, whichever is earlier, reopen the time for appeal for a period of 14 days from the date of entry of the order reopening the time for appeal.")

Accordingly, it is hereby ordered that Appellant either move for voluntary dismissal under Fed. R. App. P. 42(b) or show cause, in writing, why this appeal should not be dismissed. The failure to take either action by **July 25, 2024** may lead to dismissal of the appeal for lack of diligent prosecution. See 1st Cir. R. 3.0(b).

ADD 14

By the Court:

Maria R. Hamilton, Clerk

cc:
Michaela C. May
Joanne Walsh
Brandon L. Arber
Stephen I. Hansen
Mark C. Tatum
Ivelisse Saint-Clair

# United States Court of Appeals
## For the First Circuit

———————————

No. 24-1499

JOANNE WALSH,

Plaintiff - Appellant,

v.

HNTB CORPORATION,

Defendant - Appellee.

———————————

**ORDER OF COURT**

Entered: June 3, 2025

This matter is before the court on Appellant's response to this court's order to show cause entered July 11, 2024, and Appellee's reply. The request for dismissal set out in Appellee's reply is <u>denied</u>. The appeal will proceed to briefing, with all timeliness and other jurisdictional issues reserved to the ultimate merits panel. A briefing schedule will be entered in the ordinary course. The parties should address all relevant timeliness and other jurisdictional issues fully in their briefs.

By the Court:

Anastasia Dubrovsky, Clerk

cc:
Michaela C. May
Joanne Walsh
Brandon L. Arber
Stephen I. Hansen
Mark C. Tatum
Ivelisse Saint-Clair

ADD 16

# 28 USCS § 2107

Current through Public Law 119-20, approved June 20, 2025.

*United States Code*
*Service* > *TITLE*
*28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001)* >
*Part V. Procedure (Chs. 111 — 133)* >
*CHAPTER 133. Review—Miscellaneous Provisions (§§ 2101 — 2113)*

## § 2107. Time for appeal to court of appeals

**(a)** Except as otherwise provided in this section, no appeal shall bring any judgment, order or decree in an action, suit or proceeding of a civil nature before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree.

**(b)** In any such action, suit, or proceeding, the time as to all parties shall be 60 days from such entry if one of the parties is—

   **(1)** the United States;

   **(2)** a United States agency;

   **(3)** a United States officer or employee sued in an official capacity; or

   **(4)** a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on behalf of the United States, including all instances in which the United States represents that officer or employee when the judgment, order, or decree is entered or files the appeal for that officer or employee.

**(c)** The district court may, upon motion filed not later than 30 days after the expiration of the time otherwise set for bringing appeal, extend the time for appeal upon a showing of excusable neglect or good cause. In addition, if the district court finds—

   **(1)** that a party entitled to notice of the entry of a judgment or order did not receive such notice from the clerk or any party within 21 days of its entry, and

   **(2)** that no party would be prejudiced,

the district court may, upon motion filed within 180 days after entry of the judgment or order or within 14 days after receipt of such notice, whichever is earlier, reopen the time for appeal for a period of 14 days from the date of entry of the order reopening the time for appeal.

**(d)** This section shall not apply to bankruptcy matters or other proceedings under Title 11.

## History

**HISTORY:**

June 25, 1948, ch 646, 62 Stat. 963; May 24, 1949, ch 139, §§ 107, 108, 63 Stat. 104; Nov. 6, 1978, P. L. 95-598, Title II, § 248, 92 Stat. 2672; Dec. 9, 1991, P. L. 102-198, § 12, 105 Stat. 1627; May 7, 2009, P. L. 111-16, § 6(3), 123 Stat. 1608; Nov. 29, 2011, P. L. 112-62, § 3, 125 Stat. 757.

United States Code Service

Copyright © 2025 All rights reserved.

**End of Document**

# 29 USCS § 623, Part 1 of 4

Current through Public Law 119-34, approved August 19, 2025.

*United States Code*
*Service*        >        *TITLE*
*29. LABOR (Chs. 1 — 32)*      >
*CHAPTER 14. AGE DISCRIMINATION IN EMPLOYMENT (§§ 621 — 634)*

## § 623. Prohibition of age discrimination

**(a) Employer practices.**  It shall be unlawful for an employer—

**(1)** to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

**(2)** to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

**(3)** to reduce the wage rate of any employee in order to comply with this Act.

**(b) Employment agency practices.**  It shall be unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of such individual's age, or to classify or refer for employment any individual on the basis of such individual's age.

**(c) Labor organization practices.**  It shall be unlawful for a labor organization—

**(1)** to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his age;

**(2)** to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's age;

**(3)** to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d) Opposition to unlawful practices; participation in investigations, proceedings, or litigation.**  It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

**(e) Printing or publication of notice or advertisement indicating preference, limitation, etc.**  It shall be unlawful for an employer, labor organization, or employment agency to print or publish, or cause to be printed or published, any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, indicating any preference, limitation, specification, or discrimination, based on age.

**(f) Lawful practices; age an occupational qualification; other reasonable factors; laws of foreign workplace; seniority system; employee benefit plans; discharge or discipline for good cause.** It shall not be unlawful for an employer, employment agency, or labor organization—

**(1)** to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age, or where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause such employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located;

**(2)** to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section—

**(A)** to observe the terms of a bona fide seniority system that is not intended to evade the purposes of this Act, except that no such seniority system shall require or permit the involuntary retirement of any individual specified by section 12(a) [29 USCS § 631(a)] because of the age of such individual; or

**(B)** to observe the terms of a bona fide employee benefit plan—

**(i)** where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989); or

**(ii)** that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this Act.

Notwithstanding clause (i) or (ii) of subparagraph (B), no such employee benefit plan or voluntary early retirement incentive plan shall excuse the failure to hire any individual, and no such employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 12(a) [29 USCS § 631(a)], because of the age of such individual. An employer, employment agency, or labor organization acting under subparagraph (A), or under clause (i) or (ii) of subparagraph (B), shall have the burden of proving that such actions are lawful in any civil enforcement proceeding brought under this Act; or

**(3)** to discharge or otherwise discipline an individual for good cause.

**(g) [Deleted]**

**(h) Practices of foreign corporations controlled by American employers; foreign employers not controlled by American employers; factors determining control.**

**(1)** If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice by such employer.

**(2)** The prohibitions of this section shall not apply where the employer is a foreign person not controlled by an American employer.

**(3)** For the purpose of this subsection the determination of whether an employer controls a corporation shall be based upon the—

**(A)** interrelation of operations,

**(B)** common management,

**(C)** centralized control of labor relations, and

**(D)** common ownership or financial control, of the employer and the corporation.

**(i) Employee pension benefit plans; cessation or reduction of benefit accrual or of allocation to employee account; distribution of benefits after attainment of normal retirement age; compliance; highly compensated employees.**

**(1)** Except as otherwise provided in this subsection, it shall be unlawful for an employer, an employment agency, a labor organization, or any combination thereof to establish or maintain an employee pension benefit plan which requires or permits—

**(A)** in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age, or

**(B)** in the case of a defined contribution plan, the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age.

**(2)** Nothing in this section shall be construed to prohibit an employer, employment agency, or labor organization from observing any provision of an employee pension benefit plan to the extent that such provision imposes (without regard to age) a limitation on the amount of benefits that the plan provides or a limitation on the number of years of service or years or participation which are taken into account for purposes of determining benefit accrual under the plan.

**(3)** In the case of any employee who, as of the end of any plan year under a defined benefit plan, has attained normal retirement age under such plan—

**(A)** if distribution of benefits under such plan with respect to such employee has commenced as of the end of such plan year, then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of the actuarial equivalent of in-service distribution of benefits, and

**(B)** if distribution of benefits under such plan with respect to such employee has not commenced as of the end of such year in accordance with section 206(a)(3) of the Employee Retirement Income Security Act of 1974 [29 USCS § 1056(a)(3)] and section 401(a)(14)(C) of the Internal Revenue Code of 1986 [26 USCS § 401(a)(14)(C)], and the payment of benefits under such plan with respect to such employee is not suspended during such plan year pursuant to section 203(a)(3)(B) of the Employee Retirement Income Security Act of 1974 [29 USCS § 1053(a)(3)(B)] or section 411(a)(3)(B) of the Internal Revenue Code of 1986 [26 USCS § 411(a)(3)(B)], then any requirement of this subsection for continued accrual of benefits under such plan with respect to such employee during such plan year shall be treated as satisfied to the extent of any adjustment in the benefit payable under the plan during such plan year attributable to the delay in the distribution of benefits after the attainment of normal retirement age.

The provisions of this paragraph shall apply in accordance with regulations of the Secretary of the Treasury. Such regulations shall provide for the application of the preceding provisions of this paragraph to all employee pension benefit plans subject to this subsection and may provide for the application of such provisions, in the case of any such employee, with respect to any period of time within a plan year.

**(4)** Compliance with the requirements of this subsection with respect to an employee pension benefit plan shall constitute compliance with the requirements of this section relating to benefit accrual under such plan.

**(5)** Paragraph (1) shall not apply with respect to any employee who is a highly compensated employee (within the meaning of section 414(q) of the Internal Revenue Code of 1986 [26 USCS § 414(q)]) to the extent provided in regulations prescribed by the Secretary of the Treasury for purposes of precluding discrimination in favor of highly compensated employees within the meaning of subchapter D of chapter 1 of the Internal Revenue Code of 1986 [26 USCS §§ 401 et seq.].

**(6)** A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the subsidized portion of any early retirement benefit is disregarded in determining benefit accruals or it is a plan permitted by subsection (m).[.]

**(7)** Any regulations prescribed by the Secretary of the Treasury pursuant to clause (v) of section 411(b)(1)(h) of the Internal Revenue Code of 1986 [26 USCS § 411(b)(1)(H)(v)] and subparagraphs (C) and (D) of section 411(b)(2) of such Code shall apply with respect to the requirements of this subsection in the same manner and to the same extent as such regulations apply with respect to the requirements of such sections 411(b)(1)(H) and 411(b)(2).

**(8)** A plan shall not be treated as failing to meet the requirements of this section solely because such plan provides a normal retirement age described in section 3(24)(B) of the Employee Retirement Income Security Act of 1974 [29 USCS § 1002(24)(B)] and section 411(a)(8)(B) of the Internal Revenue Code of 1986 [26 USCS § 411(a)(8)(B)].

**(9)** For purposes of this subsection—

    **(A)** The terms "employee pension benefit plan", "defined benefit plan", "defined contribution plan", and "normal retirement age" have the meanings provided such terms in section 3 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002).

    **(B)** The term "compensation" has the meaning provided by section 414(s) of the Internal Revenue Code of 1986 [26 USCS § 414(s)].

**(10)** Special rules relating to age.

    **(A)** Comparison to similarly situated younger individual.

        **(i)** In general. A plan shall not be treated as failing to meet the requirements of paragraph (1) if a participant's accrued benefit, as determined as of any date under the terms of the plan, would be equal to or greater than that of any similarly situated, younger individual who is or could be a participant.

        **(ii)** Similarly situated. For purposes of this subparagraph, a participant is similarly situated to any other individual if such participant is identical to such other individual in every respect (including period of service, compensation, position, date of hire, work history, and any other respect) except for age.

        **(iii)** Disregard of subsidized early retirement benefits. In determining the accrued benefit as of any date for purposes of this clause, the subsidized portion of any early retirement benefit or retirement-type subsidy shall be disregarded.

        **(iv)** Accrued benefit. For purposes of this subparagraph, the accrued benefit may, under the terms of the plan, be expressed as an annuity payable at normal retirement age, the balance of a hypothetical account, or the current value of the accumulated percentage of the employee's final average compensation.

    **(B)** Applicable defined benefit plans.

        **(i)** Interest credits.

            **(I)** In general. An applicable defined benefit plan shall be treated as failing to meet the requirements of paragraph (1) unless the terms of the plan provide that any interest credit (or an equivalent amount) for any plan year shall be at a rate which is not greater than a market rate of return. A plan shall not be treated as failing to meet the requirements of this subclause merely because the plan provides for a reasonable minimum guaranteed rate of return or for a rate of return that is equal to the greater of a fixed or variable rate of return.

            **(II)** Preservation of capital. An interest credit (or an equivalent amount) of less than zero shall in no event result in the account balance or similar amount being less than the aggregate amount of contributions credited to the account.

ADD 22

**(III)** Market rate of return. The Secretary of the Treasury may provide by regulation for rules governing the calculation of a market rate of return for purposes of subclause (I) and for permissible methods of crediting interest to the account (including fixed or variable interest rates) resulting in effective rates of return meeting the requirements of subclause (I). In the case of a governmental plan (as defined in the first sentence of section 414(d) of the Internal Revenue Code of 1986 [26 USCS § 414(d)]), a rate of return or a method of crediting interest established pursuant to any provision of Federal, State, or local law (including any administrative rule or policy adopted in accordance with any such law) shall be treated as a market rate of return for purposes of subclause (I) and a permissible method of crediting interest for purposes of meeting the requirements of subclause (I), except that this sentence shall only apply to a rate of return or method of crediting interest if such rate or method does not violate any other requirement of this Act.

**(ii)** Special rule for plan conversions. If, after June 29, 2005, an applicable plan amendment is adopted, the plan shall be treated as failing to meet the requirements of paragraph (1)(H) unless the requirements of clause (iii) are met with respect to each individual who was a participant in the plan immediately before the adoption of the amendment.

**(iii)** Rate of benefit accrual. Subject to clause (iv), the requirements of this clause are met with respect to any participant if the accrued benefit of the participant under the terms of the plan as in effect after the amendment is not less than the sum of—

**(I)** the participant's accrued benefit for years of service before the effective date of the amendment, determined under the terms of the plan as in effect before the amendment, plus

**(II)** the participant's accrued benefit for years of service after the effective date of the amendment, determined under the terms of the plan as in effect after the amendment.

**(iv)** Special rules for early retirement subsidies. For purposes of clause (iii)(I), the plan shall credit the accumulation account [account] or similar amount with the amount of any early retirement benefit or retirement-type subsidy for the plan year in which the participant retires if, as of such time, the participant has met the age, years of service, and other requirements under the plan for entitlement to such benefit or subsidy.

**(v)** Applicable plan amendment. For purposes of this subparagraph—

**(I)** In general. The term "applicable plan amendment" means an amendment to a defined benefit plan which has the effect of converting the plan to an applicable defined benefit plan.

**(II)** Special rule for coordinated benefits. If the benefits of 2 or more defined benefit plans established or maintained by an employer are coordinated in such a manner as to have the effect of the adoption of an amendment described in subclause (I), the sponsor of the defined benefit plan or plans providing for such coordination shall be treated as having adopted such a plan amendment as of the date such coordination begins.

**(III)** Multiple amendments. The Secretary of the Treasury shall issue regulations to prevent the avoidance of the purposes of this subparagraph through the use of 2 or more plan amendments rather than a single amendment.

**(IV)** Applicable defined benefit plan. For purposes of this subparagraph, the term "applicable defined benefit plan" has the meaning given such term by section 203(f)(3) of the Employee Retirement Income Security Act of 1974 [29 USCS § 1053(f)(3)].

**(vi)** Termination requirements. An applicable defined benefit plan shall not be treated as meeting the requirements of clause (i) unless the plan provides that, upon the termination of the plan—

ADD 23

**(I)** if the interest credit rate (or an equivalent amount) under the plan is a variable rate, the rate of interest used to determine accrued benefits under the plan shall be equal to the average of the rates of interest used under the plan during the 5-year period ending on the termination date, and

**(II)** the interest rate and mortality table used to determine the amount of any benefit under the plan payable in the form of an annuity payable at normal retirement age shall be the rate and table specified under the plan for such purpose as of the termination date, except that if such interest rate is a variable rate, the interest rate shall be determined under the rules of subclause (I).

**(C)** Certain offsets permitted. A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the plan provides offsets against benefits under the plan to the extent such offsets are allowable in applying the requirements of section 401(a) of the Internal Revenue Code of 1986 [26 USCS § 401(a)].

**(D)** Permitted disparities in plan contributions or benefits. A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the plan provides a disparity in contributions or benefits with respect to which the requirements of section 401(l) of the Internal Revenue Code of 1986 [26 USCS § 401(l)] are met.

**(E)** Indexing permitted.

**(i)** In general. A plan shall not be treated as failing to meet the requirements of paragraph (1) solely because the plan provides for indexing of accrued benefits under the plan.

**(ii)** Protection against loss. Except in the case of any benefit provided in the form of a variable annuity, clause (i) shall not apply with respect to any indexing which results in an accrued benefit less than the accrued benefit determined without regard to such indexing.

**(iii)** Indexing. For purposes of this subparagraph, the term "indexing" means, in connection with an accrued benefit, the periodic adjustment of the accrued benefit by means of the application of a recognized investment index or methodology.

**(F)** Early retirement benefit or retirement-type subsidy. For purposes of this paragraph, the terms "early retirement benefit" and "retirement-type subsidy" have the meaning given such terms in section 203(g)(2)(A) of the Employee Retirement Income Security Act of 1974.

**(G)** Benefit accrued to date. For purposes of this paragraph, any reference to the accrued benefit shall be a reference to such benefit accrued to date.

**(j) Employment as firefighter or law enforcement officer.** It shall not be unlawful for an employer which is a State, a political subdivision of a State, an agency or instrumentality of a State or a political subdivision of a State, or an interstate agency to fail or refuse to hire or to discharge any individual because of such individual's age if such action is taken—

**(1)** with respect to the employment of an individual as a firefighter or as a law enforcement officer, the employer has complied with section 3(d)(2) of the Age Discrimination in Employment Amendments of 1996 if the individual was discharged after the date described in such section, and the individual has attained—

**(A)** the age of hiring or retirement, respectively, in effect under applicable State or local law on March 3, 1983; or

**(B)**

**(i)** if the individual was not hired, the age of hiring in effect on the date of such failure or refusal to hire under applicable State or local law enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996 [enacted Sept. 30, 1996]; or

ADD 24

**(ii)** if applicable State or local law was enacted after the date of enactment of the Age Discrimination in Employment Amendments of 1996 [enacted Sept. 30, 1996] and the individual was discharged, the higher of—

**(I)** the age of retirement in effect on the date of such discharge under such law; and

**(II)** age 55; and

**(2)** pursuant to a bona fide hiring or retirement plan that is not a subterfuge to evade the purposes of this Act.

**(k) Seniority system or employee benefit plan; compliance.** A seniority system or employee benefit plan shall comply with this Act regardless of the date of adoption of such system or plan.

**(l) Lawful practices; minimum age as condition of eligibility for retirement benefits; deduction from severance pay; reduction of long-term disability benefits.** Notwithstanding clause (i) or (ii) of subsection (f)(2)(B)—

**(1)**

**(A)** It shall not be a violation of subsection (a), (b), (c), or (e) solely because—

**(i)** an employee pension benefit plan (as defined in section 3(2) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002(2))) provides for the attainment of a minimum age as a condition of eligibility for normal or early retirement benefits; or

**(ii)** a defined benefit plan (as defined in section 3(35) of such Act [29 USCS § 1002(35)] provides for—

**(I)** payments that constitute the subsidized portion of an early retirement benefit; or

**(II)** social security supplements for plan participants that commence before the age and terminate at the age (specified by the plan) when participants are eligible to receive reduced or unreduced old-age insurance benefits under title II of the Social Security Act (42 U.S.C. 401 et seq.), and that do not exceed such old-age insurance benefits.

**(B)** A voluntary early retirement incentive plan that—

**(i)** is maintained by—

**(I)** a local educational agency (as defined in section 8101 of the Elementary and Secondary Education Act of 1965 [20 USCS § 7801]), or

**(II)** an education association which principally represents employees of 1 or more agencies described in subclause (I) and which is described in section 501(c) (5) or (6) of the Internal Revenue Code of 1986 [26 USCS § 501(c)(5) or (6)] and exempt from taxation under section 501(a) of such Code [26 USCS § 501(c)], and

**(ii)** makes payments or supplements described in subclauses (I) and (II) of subparagraph (A)(ii) in coordination with a defined benefit plan (as so defined) maintained by an eligible employer described in section 457(e)(1)(A) of such Code [26 USCS § 457(e)(1)(A)] or by an education association described in clause (i)(II),

shall be treated solely for purposes of subparagraph (A)(ii) as if it were a part of the defined benefit plan with respect to such payments or supplements. Payments or supplements under such a voluntary early retirement incentive plan shall not constitute severance pay for purposes of paragraph (2).

**(2)**

**(A)** It shall not be a violation of subsection (a), (b), (c), or (e) solely because following a contingent event unrelated to age—

ADD 25

(i)  the value of any retiree health benefits received by an individual eligible for an immediate pension;

(ii)  the value of any additional pension benefits that are made available solely as a result of the contingent event unrelated to age and following which the individual is eligible for not less than an immediate and unreduced pension; or

(iii)  the values described in both clauses (i) and (ii);

are deducted from severance pay made available as a result of the contingent event unrelated to age.

(B)  For an individual who receives immediate pension benefits that are actuarially reduced under subparagraph (A)(i), the amount of the deduction available pursuant to subparagraph (A)(i) shall be reduced by the same percentage as the reduction in the pension benefits.

(C)  For purposes of this paragraph, severance pay shall include that portion of supplemental unemployment compensation benefits (as described in section 501(c)(17) of the Internal Revenue Code of 1986 [26 USCS § 501(c)(17)]) that—

(i)  constitutes additional benefits of up to 52 weeks;

(ii)  has the primary purpose and effect of continuing benefits until an individual becomes eligible for an immediate and unreduced pension; and

(iii)  is discontinued once the individual becomes eligible for an immediate and unreduced pension.

(D)  For purposes of this paragraph and solely in order to make the deduction authorized under this paragraph, the term "retiree health benefits" means benefits provided pursuant to a group health plan covering retirees, for which (determined as of the contingent event unrelated to age)—

(i)  the package of benefits provided by the employer for the retirees who are below age 65 is at least comparable to benefits provided under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.);

(ii)  the package of benefits provided by the employer for the retirees who are age 65 and above is at least comparable to that offered under a plan that provides a benefit package with one-fourth the value of benefits provided under title XVIII of such Act; or

(iii)  the package of benefits provided by the employer is as described in clauses (i) and (ii).

(E)

(i)  If the obligation of the employer to provide retiree health benefits is of limited duration, the value for each individual shall be calculated at a rate of $3,000 per year for benefit years before age 65, and $750 per year for benefit years beginning at age 65 and above.

(ii)  If the obligation of the employer to provide retiree health benefits is of unlimited duration, the value for each individual shall be calculated at a rate of $48,000 for individuals below age 65, and $24,000 for individuals age 65 and above.

(iii)  The values described in clauses (i) and (ii) shall be calculated based on the age of the individual as of the date of the contingent event unrelated to age. The values are effective on the date of enactment of this subsection [enacted Oct. 16, 1990], and shall be adjusted on an annual basis, with respect to a contingent event that occurs subsequent to the first year after the date of enactment of this subsection [enacted Oct. 16, 1990], based on the medical component of the Consumer Price Index for all-urban consumers published by the Department of Labor.

    **(iv)** If an individual is required to pay a premium for retiree health benefits, the value calculated pursuant to this subparagraph shall be reduced by whatever percentage of the overall premium the individual is required to pay.

    **(F)** If an employer that has implemented a deduction pursuant to subparagraph (A) fails to fulfill the obligation described in subparagraph (E), any aggrieved individual may bring an action for specific performance of the obligation described in subparagraph (E). The relief shall be in addition to any other remedies provided under Federal or State law.

  **(3)** It shall not be a violation of subsection (a), (b), (c), or (e) solely because an employer provides a bona fide employee benefit plan or plans under which long-term disability benefits received by an individual are reduced by any pension benefits (other than those attributable to employee contributions)—

    **(A)** paid to the individual that the individual voluntarily elects to receive; or

    **(B)** for which an individual who has attained the later of age 62 or normal retirement age is eligible.

**(m) Voluntary retirement incentive plans.**  Notwithstanding subsection (f)(2)(B), it shall not be a violation of subsection (a), (b), (c), or (e) solely because a plan of an institution of higher education (as defined in section 101 of the Higher Education Act of 1965 [20 USCS § 1001]) offers employees who are serving under a contract of unlimited tenure (or similar arrangement providing for unlimited tenure) supplemental benefits upon voluntary retirement that are reduced or eliminated on the basis of age, if—

  **(1)** such institution does not implement with respect to such employees any age-based reduction or cessation of benefits that are not such supplemental benefits, except as permitted by other provisions of this Act;

  **(2)** such supplemental benefits are in addition to any retirement or severance benefits which have been offered generally to employees serving under a contract of unlimited tenure (or similar arrangement providing for unlimited tenure), independent of any early retirement or exit-incentive plan, within the preceding 365 days; and

  **(3)** any employee who attains the minimum age and satisfies all non-age-based conditions for receiving a benefit under the plan has an opportunity lasting not less than 180 days to elect to retire and to receive the maximum benefit that could then be elected by a younger but otherwise similarly situated employee, and the plan does not require retirement to occur sooner than 180 days after such election.

## History

**HISTORY:**

Dec. 15, 1967, P. L. 90-202, § 4, 81 Stat. 603; April 6, 1978, P. L. 95-256, § 2(a), 92 Stat. 189 Sept. 3, 1982, P. L. 97-248, Title I, Subtitle A, Part I, Subpart C, § 116(a), 96 Stat. 353; July 18, 1984, P. L. 98-369, Division B, Title III, Subtitle A, Part I, § 2301(b), 98 Stat. 1063; Oct. 9, 1984, P. L. 98-459, Title VIII, § 802(b), 98 Stat. 1792; April 7, 1986, P. L. 99-272, Title IX, Part 2, Subpart A, § 9201(b)(1), (3), 100 Stat. 171; Oct. 21, 1986, P. L. 99-509, Title IX, Subtitle C, § 9201, 100 Stat. 1973; Oct. 31, 1986, P. L. 99-592, §§ 2(a), (b), 3, 100 Stat. 3342; Dec. 19, 1989, P. L. 101-239, Title VI, Subtitle A, Part 3, Subpart A, § 6202(b)(3)(C)(i), (ii), 103 Stat. 2233; Oct. 16, 1990, P. L. 101-433, Title I, § 103, 104 Stat. 978; Nov. 5, 1990, P. L. 101-521, 104 Stat 2287; Sept. 30, 1996, P. L. 104-208, Div A, Title I, § 101(a) [Title I, § 119(subsec. 1(b))], 110 Stat. 3009-23; Oct. 7, 1998, P. L. 105-244, Title IX, Part D, § 941(a), (b), 112 Stat. 1834; Aug. 17, 2006, P. L. 109-280, Title VII, § 701(c), Title XI, § 1104(a)(2), 120 Stat. 988, 1058; Dec. 23, 2008, P. L. 110-458, Title I, Subtitle B, § 123(a), 122 Stat. 5114; Dec. 10, 2015, P. L. 114-95, Title IX, Part B, § 9215(e), 129 Stat. 2166.

United States Code Service

Copyright © 2025 All rights reserved.

**End of Document**

# ALM GL ch. 151B, § 4(1B)

Current through Chapter 13 of the 2025 Legislative Session of the 194th General Court

*Annotated Laws of*
*Massachusetts        >*
*PART I ADMINISTRATION OF THE GOVERNMENT (Chs. 1 - 182)        >*
*TITLE XXI LABOR AND INDUSTRIES (Chs. 149 - 154)        >*
*TITLE XXI LABOR AND INDUSTRIES (Chs. 149 — 154)        >*
*Chapter 151B Unlawful Discrimination Because of Race, Color, Religious Creed, National Origin,*
*Ancestry or Sex (§§ 1 — 10)*

## Notice

⚑ This section has more than one version with varying effective dates.

## § 4. Unlawful Practices.

It shall be an unlawful practice:

. . .

**1B.**  For an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

. . .

## History

1946, 368, § 4; 1947, 424; 1950, 697, §§ 6-8; 1955, 274; 1957, 426, §§ 2, 3; 1959, 239, § 2; 1960, 163, § 2; 1961, 128; 1963, 197, § 2; 1965, 213, § 2; 1965, 397, §§ 4-6; 1966, 361; 1969, 90; 1969, 314; 1971, 661; 1971, 726; 1971, 874, §§ 1-3; 1972, 185; 1972, 428; 1972, 542; 1972, 786, § 2; 1972, 790, § 2; 1973, 168; 1973, 187, §§ 1-3; 1973, 325; 1973, 701, § 1; 1973, 929; 1973, 1015, §§ 1-3; 1974, 531; 1975, 84; 1975, 367, § 3; 1975, 637, §§ 1, 2; 1978, 89; 1978, 288, §§ 1, 2; 1979, 710, § 2; 1980, 343; 1983, 533, §§ 4-6; 1983, 585, § 7; 1983, 628, §§ 1-3; 1984, 266, §§ 5-7; 1985, 239; 1986, 588, § 3; 1987, 270, § 1, 2, 1987, 775, § 11; 1989, 516, §§ 4-14; 1989, 544; 1989, 722, §§ 13-23; 1990, 177, § 341; 1990, 283, §§ 2, 3; 1996, 262; 1997, 2, § 2; 1997, 19, §§ 105, 106; 1998, 161 § 532; 2000, 254, §§ 6-23A; 2001, 11, §§ 1, 2; 2003, 26, § 589; 2004, 355, § 1; 2006, 291, §§ 1, 2; 2010, 256, § 101; 2011, 199, § 7; 2014, 484, § 2; 2016, 141, §§ 22-24, effective July 14, 2016; 2017, 54, §§ 1, 2, effective April 1, 2018; 2018, 69, §§ 103, 104, effective October 13, 2018; 2023, 7, § 290, effective May 30, 2023; 2024, 205, § 76, effective September 12, 2024.

Annotated Laws of Massachusetts
Copyright © 2025 All rights reserved.

ALM GL ch. 151B, § 4

---

**End of Document**

# USCS Fed Rules App Proc R 3

Current through changes received through July 21, 2025.

*USCS Federal Rules*

*Annotated* >
*Federal Rules of Appellate Procedure* >
*II. Appeal from a Judgment or Order of a District Court*

## Rule 3. Appeal as of Right — How Taken

**(a) Filing the Notice of Appeal.**

**(1)** An appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal with the district clerk within the time allowed by Rule 4. At the time of filing, the appellant must furnish the clerk with enough copies of the notice to enable the clerk to comply with Rule 3(d).

**(2)** An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.

**(3)** An appeal from a judgment by a magistrate judge in a civil case is taken in the same way as an appeal from any other district court judgment.

**(4)** An appeal by permission under 28 U.S.C. § 1292(b) or an appeal in a bankruptcy case may be taken only in the manner prescribed by Rules 5 and 6, respectively.

**(b) Joint or Consolidated Appeals.**

**(1)** When two or more parties are entitled to appeal from a district-court judgment or order, and their interests make joinder practicable, they may file a joint notice of appeal. They may then proceed on appeal as a single appellant.

**(2)** When the parties have filed separate timely notices of appeal, the appeals may be joined or consolidated by the court of appeals.

**(c) Contents of the Notice of Appeal.**

**(1)** The notice of appeal must:

**(A)** specify the party or parties taking the appeal by naming each one in the caption or body of the notice, but an attorney representing more than one party may describe those parties with such terms as "all plaintiffs," "the defendants," "the plaintiffs A, B, et al.," or "all defendants except X";

**(B)** designate the judgment—or the appealable order—from which the appeal is taken; and

**(C)** name the court to which the appeal is taken.

**(2)** A pro se notice of appeal is considered filed on behalf of the signer and the signer's spouse and minor children (if they are parties), unless the notice clearly indicates otherwise.

**(3)** In a class action, whether or not the class has been certified, the notice of appeal is sufficient if it names one person qualified to bring the appeal as representative of the class.

**(4)** The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal.

USCS Fed Rules App Proc R 3

**(5)** In a civil case, a notice of appeal encompasses the final judgment, whether or not that judgment is set out in a separate document under Federal Rule of Civil Procedure 58, if the notice designates:

**(A)** an order that adjudicates all remaining claims and the rights and liabilities of all remaining parties; or

**(B)** an order described in Rule 4(a)(4)(A).

**(6)** An appellant may designate only part of a judgment or appealable order by expressly stating that the notice of appeal is so limited. Without such an express statement, specific designations do not limit the scope of the notice of appeal.

**(7)** An appeal must not be dismissed for informality of form or title of the notice of appeal, for failure to name a party whose intent to appeal is otherwise clear from the notice, or for failure to properly designate the judgment if the notice of appeal was filed after entry of the judgment and designates an order that merged into that judgment.

**(8)** Forms 1A and 1B in the Appendix of Forms are suggested forms of notices of appeal.

**(d) Serving the Notice of Appeal.**

**(1)** The district clerk must serve notice of the filing of a notice of appeal by sending a copy to each party's counsel of record—excluding the appellant's—or, if a party is proceeding pro se, to the party's last known address. When a defendant in a criminal case appeals, the clerk must also serve a copy of the notice of appeal on the defendant. The clerk must promptly send a copy of the notice of appeal and of the docket entries—and any later docket entries—to the clerk of the court of appeals named in the notice. The district clerk must note, on each copy, the date when the notice of appeal was filed.

**(2)** If an inmate confined in an institution files a notice of appeal in the manner provided by Rule 4(c), the district clerk must also note the date when the clerk docketed the notice.

**(3)** The district clerk's failure to serve notice does not affect the validity of the appeal. The clerk must note on the docket the names of the parties to whom the clerk sends copies, with the date of sending. Service is sufficient despite the death of a party or the party's counsel.

**(e) Payment of Fees.** Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.

## History

Amended April 30, 1979, eff. Aug. 1, 1979; March 10, 1986, eff. July 1, 1986; April 25, 1989, eff. Dec. 1, 1989; April 22, 1993, eff. Dec. 1, 1993; April 29, 1994, eff. Dec. 1, 1994; April 24, 1998, eff. Dec. 1, 1998; April 25, 2019, eff. Dec. 1, 2019; April 14, 2021, eff. Dec. 1, 2021.

USCS Federal Rules Annotated
Copyright © 2025 All rights reserved.

**End of Document**

ADD 32

# USCS Fed Rules App Proc R 4, Part 1 of 2

Current through changes received through July 21, 2025.

*USCS Federal Rules*

*Annotated              >*
*Federal Rules of Appellate Procedure              >*
*II. Appeal from a Judgment or Order of a District Court*

## Rule 4. Appeal as of Right — When Taken

**(a) Appeal in a Civil Case.**

  **(1)** *Time for Filing a Notice of Appeal.*

    **(A)** In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

    **(B)** The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

      **(i)** the United States;

      **(ii)** a United States agency;

      **(iii)** a United States officer or employee sued in an official capacity; or

      **(iv)** a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf— including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

    **(C)** An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

  **(2)** *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order — but before the entry of the judgment or order — is treated as filed on the date of and after the entry.

  **(3)** *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

  **(4)** *Effect of a Motion on a Notice of Appeal.*

    **(A)** If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure—and does so within the time allowed by those rules—the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

      **(i)** for judgment under Rule 50(b);

      **(ii)** to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

      **(iii)** for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

**(iv)** to alter or amend the judgment under Rule 59;

**(v)** for a new trial under Rule 59; or

**(vi)** for relief under Rule 60 if the motion is filed within the time allowed for filing a motion under Rule 59.

**(B)**

**(i)** If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

**(ii)** A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

**(iii)** No additional fee is required to file an amended notice.

**(5)** *Motion for Extension of Time.*

**(A)** The district court may extend the time to file a notice of appeal if:

**(i)** a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

**(ii)** regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

**(B)** A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

**(C)** No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

**(6)** *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

**(A)** the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

**(B)** the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

**(C)** the court finds that no party would be prejudiced.

**(7)** *Entry Defined.*

**(A)** A judgment or order is entered for purposes of this Rule 4(a):

**(i)** if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

**(ii)** if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

- the judgment or order is set forth on a separate document, or

ADD 34

- 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

**(B)** A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

**(b) Appeal in a Criminal Case.**

**(1)** *Time for Filing a Notice of Appeal.*

**(A)** In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

**(i)** the entry of either the judgment or the order being appealed; or

**(ii)** the filing of the government's notice of appeal.

**(B)** When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

**(i)** the entry of the judgment or order being appealed; or

**(ii)** the filing of a notice of appeal by any defendant.

**(2)** *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision, sentence, or order — but before the entry of the judgment or order — is treated as filed on the date of and after the entry.

**(3)** *Effect of a Motion on a Notice of Appeal.*

**(A)** If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

**(i)** for judgment of acquittal under Rule 29;

**(ii)** for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

**(iii)** for arrest of judgment under Rule 34.

**(B)** A notice of appeal filed after the court announces a decision, sentence, or order — but before it disposes of any of the motions referred to in Rule 4(b)(3)(A) — becomes effective upon the later of the following:

**(i)** the entry of the order disposing of the last such remaining motion; or

**(ii)** the entry of the judgment of conviction.

**(C)** A valid notice of appeal is effective — without amendment — to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

**(4)** *Motion for Extension of Time.* Upon a finding of excusable neglect or good cause, the district court may — before or after the time has expired, with or without motion and notice — extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

**(5)** *Jurisdiction.* The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

ADD 35

USCS Fed Rules App Proc R 4, Part 1 of 2

**(6)** *Entry Defined.* A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

**(c) Appeal by an Inmate Confined in an Institution.**

**(1)** If an institution has a system designed for legal mail, an inmate confined there must use that system to receive the benefit of this Rule 4(c)(1). If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing and:

**(A)** it is accompanied by:

**(i)** a declaration in compliance with 28 U.S.C. § 1746—or a notarized statement—setting out the date of deposit and stating that first-class postage is being prepaid; or

**(ii)** evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid; or

**(B)** the court of appeals exercises its discretion to permit the later filing of a declaration or notarized statement that satisfies Rule 4(c)(1)(A)(i).

**(2)** If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

**(3)** When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d) Mistaken Filing in the Court of Appeals.** If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.

## History

Amended April 30, 1979, effective Aug. 1, 1979; Nov. 18, 1988, P. L. 100-690, Title VII, Subtitle C, § 7111, 102 Stat. 4419; April 30, 1991, eff. Dec. 1, 1991; April 22, 1993, eff. Dec. 1, 1993; April 27, 1995, eff. Dec. 1, 1995; April 24, 1998, eff. Dec. 1, 1998; April 29, 2002, eff. Dec. 1, 2002; April 25, 2005, eff. Dec. 1, 2005; March 26, 2009, eff. Dec. 1, 2009; April 28, 2010, eff. Dec. 1, 2010; April 26, 2011, eff. Dec. 1, 2011; April 28, 2016, eff. Dec. 1, 2016; April 27, 2017, eff. Dec. 1, 2017; April 24, 2023, eff. Dec. 1, 2023.

USCS Federal Rules Annotated
Copyright © 2025 All rights reserved.

**End of Document**

ADD 36